# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

Nos. 07-1182, 07-1190 & 07-1191

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIM BAILEY, SHANE D. WILLIAMS, AND
ORLANDO ALEXANDER,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Central District of Illinois.
No. 02-CR-10144—**Joe Billy McDade**, *Judge.*

———————

ARGUED SEPTEMBER 17, 2007—DECIDED DECEMBER 18, 2007

———————

Before FLAUM, RIPPLE, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Nettlesome issues arise when federal authorities disassemble a drug-distribution racket. The government must often prove its case through the testimony of informants with a checkered past or former members of the conspiracy that are cooperating to gain quarter in their own cases. The defendants themselves frequently have prior records or indiscretions, requiring the trial court to monitor any evidence that would prove to be unduly prejudicial. Then there is the need to prove the conspiracy itself, an agreement that often exists merely in a shared understanding or coordinated activity.

This case raises all of these issues. Defendants-appellants, Shane Williams, Tim Bailey, and Orlando Alexander appeal their convictions, which stem from their participation in a crack-distribution ring in Peoria, Illinois. The enterprise stretched from Chicago down to Peoria, spanned twelve years, and involved at least two street gangs—the Black Disciples and the Vice Lords. Eventually law enforcement caught wind of the operation, and these prosecutions ensued. On July 21, 2004, a grand jury returned an indictment against the defendants and, on February 9, 2006, a jury convicted all three on most of the counts in the indictment.

Williams stood convicted of one count of conspiracy and two counts of distributing crack. For his involvement, the jury convicted Bailey of one count of conspiracy and one count of distributing more than fifty grams of crack. Finally, the jury convicted Alexander of one count of conspiracy and one count of distributing more than five grams of crack. Williams and Bailey received 240 months', and Alexander 180 months' imprisonment. They now appeal, raising several issues relating to the investigation and prosecution of the offenses. Finding no error, we affirm.

## I.  Background

All three defendants are members of gangs, though not the same one. Shane Williams is a member of the Black Disciples, a gang that began in Chicago and was eventually overseen by a man named Sylvester "Star" Mickle. Beginning in 1989, with Mickle at the helm, the Black Disciples developed a far-reaching drug-distribution scheme that ran from their headquarters in Chicago down to Peoria, Illinois. Eventually, Williams joined the operation in Peoria and, after a few years of yeoman's work selling crack, he came to head his own distribution net-

work in 1996. In 1999, Mickle promoted Williams to "minister" and Williams headed the Black Disciples' entire drug-distribution operations in Peoria.

Williams functioned mostly as a middleman who would move crack from upstream distributors to downstream Peoria dealers or users. As business boomed, Williams was able to expand his downstream crack-distribution business to include his brother, Bailey, and his brother's friend, Alexander, who were both members of a rival gang, the Vice Lords. Throughout the 1990s and the early 2000s, the Black Disciples and Vice Lords accounted for much of the crack sales in Peoria. Although they initially divided Peoria into territories, the gangs soon came to realize that they had more to gain through cooperation than conflict; and strict adherence to their former turf soon eroded. In the spirit of cooperation, Williams began purchasing crack from a Vice Lord supplier, Mario Thompson, buying multiple ounces a week for several months until Thompson's arrest in January 2002. Thompson also sold lesser quantities of drugs to Alexander—quarter ounces or "eight balls"—during the months before his arrest.

Even though he had Thompson as a supplier, Williams continued to buy drugs from Mickle. At least once in 2002, he and Bailey traveled to Chicago to resupply. At trial, a government witness, John T. Williams (to our knowledge, no relation), would testify that he had seen Bailey accompany Williams to Mickle's father's house on several occasions to purchase crack. John T. Williams said that Bailey would wait in the car during the transaction, sometimes coming to the front door to spur Williams along if the deal took too long. Bailey could not join Williams inside Mickle's father's house because of his different gang affiliation; the détente between the Black Disciples and the Vice Lords only went so far.

Williams, Bailey, and Alexander worked the Taft Homes, a government-assisted housing project run by the Peoria

Housing Authority ("PHA"). Bailey and Alexander would regularly sell user-quantities of crack to residents in the Taft Homes or would serve as liaisons between interested buyers and Williams. One such buyer was Victon Bethel, a resident of the Taft Homes who had bought several "eight balls" of crack from Alexander during the spring and summer of 2002. Unbeknownst to Alexander, Bethel had become a paid informant for the Peoria Police Department at around the same time. Bethel's brother was on trial for murder and Bethel wanted to make money to pay down the legal fees. So he contacted the Peoria Police Department to become a paid informant.

Under the guidance of the Peoria Police Department, Bethel agreed to wear a wire and arrange sales of crack cocaine from Alexander. On August 13, 2002, Bethel spoke to Alexander and arranged a purchase. Later that day, Alexander and Williams arrived at Bethel's home where Williams sold Bethel twenty-four grams of crack for $900. Soon afterwards, Alexander cut out the middleman and gave Williams' pager number to Bethel. On August 21, 2002, Bethel called Williams to set up a sale, but Williams directed Bethel to another seller, Adrian Shird. Bethel met Shird later in the day and paid him $1800 for two ounces of crack.

On August 29, 2002, the final sale occurred. Bethel called Alexander to purchase two more ounces. After getting in touch with Alexander, Bethel walked to the Taft Homes and waited near his mother's house. After a few minutes of waiting, Bethel received a call from Williams. Although Williams said he had not talked to Alexander, he told Bethel that Bailey would be coming with at least an ounce of crack. Soon enough, Bailey arrived, but without all of the promised supply. For some reason, Bailey was not able to complete the sale right away, and it took some work to get the promised amount, involving a few calls to Williams. Bailey left Bethel, only to return

a few minutes later to say that the drugs would arrive shortly. Bailey left again and Alexander reappeared, remaining on the scene and even putting his cell phone to Bethel's ear so that Bailey could again reassure him that the drugs would be arriving shortly. Bethel understood Alexander to be engaging in customer relations, "making sure that [Bethel] still wanted what [he] had asked him for." A few hours later Bailey returned in his car with the full two ounces—the amount that Bethel had originally ordered from Alexander. After delivery, Bethel paid Bailey $1800 and Alexander got into Bailey's car and drove off.

On January 21, 2003, the police arrested Bailey, Williams, and Alexander. During a search of Williams' residence after his arrest, the police confiscated a pager, a cell phone, two handguns and a digital scale. On January 21, 2004, a grand jury issued a five-count superseding indictment against Williams, Bailey, and Alexander. Count One charged the three with a drug conspiracy. Counts Two through Four charged the three for their involvement in the controlled sales to Bethel: Count Two charged Williams and Alexander with distributing more than five grams of crack during the August 13, 2002 sale; Count Three charged Williams alone for distributing more than fifty grams of crack based on the August 21, 2002 sale; and Count Four charged all three with distributing more than fifty grams of crack based on the August 29, 2002 sale. Finally, Count Five charged Williams with possessing a firearm in furtherance of a drug crime, based on a gun found in his residence after his arrest.

All three plead not guilty and requested a jury trial. Before trial, Bailey learned from the government that the Peoria Police Department and the Drug Enforcement Agency had paid Bethel, who would be testifying at trial. Bailey filed a motion in limine requesting Bethel's federal income-tax records; Bailey suspected that Bethel

had not paid income taxes on his informant payments and claimed that the records were necessary for effective cross-examination. The government had told Bailey that it did not have the records and that applicable tax-return disclosure laws forbade production anyway. The district court denied Bailey's motion without elaboration. Bethel ultimately testified at trial that he had not reported his informant payments as income on his tax returns.

At trial, the government put forth several witnesses against the three men. The majority of the government's thirteen lay witnesses were either Black Disciples or Vice Lords; all were familiar with Peoria's crack market and the defendants' involvement. As former participants in the crack trade, the witnesses were not exactly wilting lilies. Mario Thompson was serving a life term for crack distribution; John T. Williams, 240 months; Martez Harris, 260 months; Ometries Barnes, 232 months; to name a few. They testified as to their prior involvement in the drug market, their personal drug use at the time of their involvement, and, for those who were in prison, their hopes of securing reduced sentences in exchange for their testimony. On cross-examination, the defendants questioned the witnesses at length regarding these points and, on some occasions, pointed to inconsistencies in their testimony or impeached them with prior inconsistent statements.

One witness was John T. Williams who testified that he had seen several of the crack sales that Mickle had made to Williams and recounted how Bailey would usually wait in the car. At a sidebar, Bailey's attorney moved to strike the testimony. He argued that the fact that Bailey waited in the car was prejudicial and did not establish "any type of conspiracy." The district court denied the motion to strike, reasoning that it was relevant to whether a conspiracy existed.

Another witness was Officer James Feehan, a PHA security guard from the Taft Homes who had once arrested Bailey for trespassing. The PHA maintained a "trespass list," a running tally of people that were not allowed on PHA property. When the PHA learned that someone on the list was on the premises of a PHA complex, they would arrest him for trespassing. Both Williams and Bailey were on the list, but Alexander was not. On May 28, 2002, Feehan investigated a report that Williams and Bailey were entering the apartments of some residents of the Taft Homes. At trial he began to testify that upon receiving information that Bailey was in the Taft Homes, he had arrested him. Bailey's attorney objected to the testimony under Rule 404, as a prior bad act. The court admitted the testimony, reasoning that it tended to show why Bailey would need Alexander's help selling drugs in the Taft Homes: Because Bailey was persona non grata, he would need Alexander to do the leg work. The court did not consider the prejudice to be "unreasonable . . . because all he is showing is that [Bailey] was on the trespass list."

On February 9, 2006, the jury returned its verdict. It convicted all three men of conspiracy. In addition, the jury convicted Williams and Alexander for distributing more than five grams of crack based on the August 13, 2002 controlled sale. The jury also convicted Williams and Bailey for the August 29, 2002 sale of more than fifty grams of crack, but acquitted Alexander. Finally, the jury acquitted Williams on both the August 21, 2002 sale, in which Williams passed Bethel along to Shird, and the firearm charge.

On January 17, 2007, the district court sentenced Williams and Bailey to 240 months' imprisonment and Alexander to 180 months. For Williams, the presentence investigation report recommended a base offense level of 38. After adding two levels for firearm possession, two

levels for using a minor to distribute drugs, and four levels for his role in the offense, his total offense level went up to 46. Due to his category III criminal history, Williams' PSR recommended life imprisonment. At sentencing, however, the court struck the firearm and use-of-a-minor enhancements, lowering the offense level to 42 and the minimum sentence to 360 months. Based on mitigating factors, the court further reduced Williams term in prison to 240 months. The three now appeal.

## II. Discussion

Williams, Bailey, and Alexander raise a number of issues on appeal. Williams appeals both the sufficiency of the evidence supporting his conviction and the reasonableness of his sentence. Bailey appeals the district court's refusal to compel production of Bethel's tax records and its admission of testimony concerning both his trespassing arrest and his presence in the car during Williams' drug purchases. Finally, Alexander appeals the sufficiency of the evidence linking him to the overall conspiracy. The following sections discuss each appeal in turn.

### A. Williams' Appeal

#### 1. The Sufficiency of the Evidence

Challenging the sufficiency of the evidence on appeal is a "daunting task." *United States v. McCaffrey*, 181 F.3d 854, 856 (7th Cir. 1999). The question is not whether this Court considers the evidence insufficient to prove guilt beyond a reasonable doubt. Instead, this Court will affirm a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Griffin*, 150 F.3d 778,

784 (7th Cir. 1998) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To be irrational, a verdict must not rest on any "evidence, regardless of how it is weighed, from which the trier of fact could find guilt." *Id.* (citing *United States v. Grier*, 866 F.2d 908, 923 (7th Cir. 1989)). An appeal does not lend itself well to challenging the credibility of witnesses, *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996), as this Court construes all evidence in the light most favorable to the government, defers to the jury in assessing credibility, and resolves all conflicts in the evidence in favor of the government. *Griffin*, 150 F.3d at 784-85.

The jury convicted Williams of conspiring to possess and conspiring to distribute crack cocaine and two counts of distributing crack. Williams argues that insufficient evidence supports the jury's verdicts. First, Williams argues that the government's witnesses were "incredible as a matter of law" because, he alleges, they were drug users during the relevant times forming the basis for their testimony. Second, Williams argues that the evidence surrounding the controlled buys was equivocal at best and does not corroborate the witnesses. He argues that the recordings are of poor quality, the witnesses who identified his voice on the tapes were not credible, and that there is no solid evidence that he said he would send his brother, Bailey.

### i.  Credibility of Government's Witnesses

At trial, the government brought in thirteen lay witnesses, most of whom had damning things to say about Williams. To parry the blow of their testimony, Williams asks this Court to deem the testimony of the witnesses who testified against him incredible as a matter of law. Williams argues that the government's lay witnesses should not be believed because they were drug users at

the time of the investigation and had ulterior motives aside from fulfilling their civic duties.

This is a tall order, which we decline to fill. Though undoubtedly not pillars of society, the government's witnesses were not unbelievable as a matter of law by virtue of their drug use. A witness's testimony is incredible as a matter of law if it is "physically impossible for the witness to [have] observe[d] that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Hunter*, 145 F.3d 946, 949-50 (7th Cir. 1998) (quoting *United States v. Saulter*, 60 F.3d 170, 275 (7th Cir. 1995)). Even if the witness testifies as to a period during which he was under the influence of drugs, a jury is entitled to believe the witness and can discount the testimony as it sees fit. *See United States v. Blackman*, 950 F.2d 420, 424 (7th Cir. 1991) (holding that just because a witness was a drug user, the jury could believe him).

Because he cannot point to any suspended laws of nature, Williams argues that the government's witnesses were unbelievable as a matter of law because they were drug users during the relevant period of the investigation. Bethel, for example, smoked marijuana the morning of the August 29, 2002 controlled buy. John T. Williams, who testified that Bailey would always wait in the car while Williams was inside purchasing crack, testified that he smoked marijuana everyday during the relevant period. Most of the other witnesses' testimony was, unfortunately, a variation on a theme. Because these witnesses' drug use coincided with the period forming the basis of their testimony, Williams asks this Court to exclude it.

It is probably true that witnesses who were stoned during the relevant parts of the investigation did not have all their wits about them, making their memories

fuzzy when they took the stand. This could, in turn, lessen the credence that is owed to their version of events. But it is for the jury to evaluate the credibility of the witnesses, including any cloudiness brought on by their drug use. *United States v. Wilson*, 31 F.3d 510, 514 (7th Cir. 1994) (stating that this Court will uphold conviction "even if the evidence is 'totally uncorroborated and comes from an admitted liar, convicted felon, large-scale drug dealing, paid government informant'" (quoting *United States v. Davis*, 15 F.3d 1393, 1398 (7th Cir. 1994))). A prophylactic rule that drug-using witnesses are *per se* unbelievable would derail most drug prosecutions which frequently involve, of necessity, the testimony of drug users. These witnesses' shortcomings must be accounted for through cross-examination, not an exclusionary rule. Accordingly, we will not upset the jury's decision to credit their testimony.

For similar reasons, that a witness has cooperated in exchange for a shortened prison sentence or, in Bethel's case, money, does not change the outcome. Although the use of informants is "an unattractive business," *United States v. Kaminski*, 703 F.2d 1004, 1010 (7th Cir. 1983), it is far from an upstart; "[c]ourts have countenanced the use of informers from time immemorial." *United States v. Dennis*, 183 F.2d 201, 224 (2d Cir. 1950) (Hand, J.). Unveiling criminal operations in which the participants have a strong incentive to conceal their efforts often requires coopting those who had once engaged in the same sordid business. *Id.* Motivating these informants requires consideration, such as a shortened sentence or cash. In some circumstances, a trial court should issue a cautionary instruction with respect to an informant's testimony. *See United States v. Cook*, 102 F.3d 249, 254-55 (7th Cir. 1996) (Ripple, J., concurring) (collecting cases). But this is not that case. Several witnesses detailed their involvement with Williams in the crack trade. One wit-

ness, Bethel, produced recordings that memorialized some of these transactions. Further, the attorneys for all three defendants pointed out the carrots motivating the witnesses on cross-examination. Thus, neither the drug use nor the use of incentives (whether viewed in isolation or in tandem) justifies excluding the testimony as incredible.

### ii. Conspiracy

After concluding that the witnesses' testimony was not incredible as a matter of law, Williams' conspiracy conviction must stand. A drug conspiracy requires an "agreement between two or more persons to possess with intent to distribute cocaine base, the defendants' knowledge of the agreement, and their intention to join it." *United States v. Billops*, 43 F.3d 281, 284 (7th Cir. 1994). But the nub of a conspiracy is an agreement, and the government can prove the agreement by showing "an understanding—explicit or implicit—among co-conspirators to work together to commit te offense." *United States v. Bustamante*, 493 F.3d 879, 884 (7th Cir. 2007) (quoting *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003)). Evidence of a conspiracy depends on the criminal endeavor. In a crack conspiracy, the evidence involves efforts to move crack down the supply chain from the distributor to the market (through buying, selling, finding buyers, distribution) or providing support to the operation through force, financing, or concealment. Thus, although no overt act is required under 21 U.S.C. § 846, *see United States v. Shabani*, 513 U.S. 10, 11 (1994), this Court has credited the purchase of large quantities of drugs, cooperation in the distribution of drugs, regular or standardized dealings, sales on credit, and prolonged cooperation. *See Bustamante*, 493 F.3d at 884-85 (collecting cases). In proving its case, the government can rely on both direct and circumstantial evidence.

Aside from questioning the reliability of the government's witnesses, Williams points to little that would undermine his conviction. He questions the quality of the government's audiotapes and points to a lack of corroboration of Williams' involvement with Bailey. But, as discussed more fully above, the evidence of his guilt is overwhelming. Several witnesses discussed aspects of Williams' ascendancy and involvement in the Peoria crack market. From 1996 to 2003, Williams ran the Black Disciples' crack operation in Peoria. Multiple witnesses testified as to their personal involvement in drug transactions with Williams, often for large amounts of crack from distributors like Mickle and Thompson. Bethel also testified that he had purchased crack from Williams and Alexander on August 13, 2002. This evidence is sufficient to establish an agreement between Williams and Alexander and Williams and Bailey to distribute crack.

### iii.  Distribution Counts

Similarly, sufficient evidence supports Williams' conviction for the August 13, 2002 and August 29, 2002 sales. To prove a violation of 21 U.S.C. § 841(a)(1), the government must show that the defendant knowingly and intentionally distributed crack and that the defendant knew that the substance was crack. *United States v. Johnson*, 127 F.3d 625, 628 (7th Cir. 1997). And "distribution" consists of the "transfer of possession from one person to another." *Id.* In addition, whoever "causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b) (2006).

The evidence at trial supports Williams' convictions. First, Bethel testified that he purchased twenty-four grams of crack directly from Williams on August 13, 2002

after calling Alexander to set up a sale of "zip," which Bethel testified was a street name for crack. Audio recordings of the sale corroborated Bethel's testimony regarding the conversation with Alexander and the subsequent sale by Williams and Alexander. At trial, the government would also present photos of the transacted substance, which Bethel had turned over to the police. Second, Bethel testified that he purchased fifty-three grams of crack from Bailey on August 29, 2002 after placing an order with Williams over the phone. Again, audio recordings corroborate Bethel's testimony regarding his conversations with Williams. As Williams had promised, Bailey soon arrived. When Bailey had trouble getting Bethel the agreed-upon amount, Bailey's and Williams' phone records confirm that the two were in constant contact. Ultimately, after several calls to Williams, Bailey delivered two ounces of crack to Bethel. At trial, the government presented pictures of the distributed substance, which Bethel had turned over to the police. In short, Bethel ordered crack from Williams and received it from Bailey, as Williams had promised. This is sufficient to show that Williams "cause[d]" the distribution of crack to Bethel for purposes of 21 U.S.C. § 841 and 18 U.S.C. § 2. The evidence from the controlled buys is thus sufficient to support Williams' distribution convictions.

### 2. Reasonableness of Sentence

Finally, Williams challenges his sentence, arguing that it is "excessive," but the jury's verdict forecloses this argument. The district court rejected the PSR's findings that would have resulted in life in prison. It even varied from the advisory Guidelines range requiring thirty years in prison down to twenty. Given how central Williams was to a decade-long drug conspiracy, a sentence that is

ten years below the advisory Guidelines range is not "excessive."

### B.  Bailey's Appeal

#### 1.  District Court's Refusal to Compel Production of Bethel's Tax Records

Bailey argues on appeal that the district court erred in denying his request for the production of Bethel's tax records. Citing *Brady v. Maryland*, 373 U.S. 83 (1963), he argues that the government denied his constitutional right to exculpatory evidence and that a judgment of acquittal is in order. The government disagrees, arguing first that it is not clear that it could have produced the documents at all and, second, that the defendant was not prejudiced by the lack of the records because Bethel admitted that he did not pay taxes on his informant income.

It is not necessary to determine whether the district court erred or whether the government in fact had an obligation to track down and turn over Bethel's tax records. Even if it was error to not produce the tax returns, Bailey was not prejudiced by their absence. Nondisclosure of material exculpatory evidence can deny an accused a fair trial. *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* Conversely, "[e]vidence that impeaches an already thoroughly impeached witness is the definition of 'cumulative impeachment' evidence and its suppression cannot give rise to a *Brady* violation." *United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994).

Because the tax records would have been cumulative, the district court did not err in refusing to order their

disclosure. Even if Bailey had the tax records, the testimony at trial would not have changed one jot. Bailey cross-examined Bethel on whether he had paid taxes on his informant income. Bethel said that he had not, an admission that would ostensibly undermine his credibility. It is thus hard to see what benefit Bailey would have obtained by the tax records. The impeaching bell had been rung; the tax records would not have amplified the toll. *Kozinski*, 16 F.3d at 819 (stating that cumulative evidence is not material); *United States v. Dweck*, 913 F.2d 365, 371 (7th Cir. 1990) (same). Because there is no "reasonable probability" that the cumulative evidence would have changed the outcome, it was not material and no relief is available under *Brady*.

### 2. Testimony Regarding Bailey's Trespass Arrest

Bailey argues that the district court erred in permitting Officer James Feehan to testify about Bailey's trespassing arrest in May 2002. The district court admitted the testimony after first concluding both that it showed why Bailey would need Alexander to serve as a liaison in the Taft Homes and that the probative value outweighed any likely prejudice. On appeal, Bailey argues that the trespassing arrest is inadmissible as a prior bad act.

Even if the evidence should not have been admitted, the error was harmless. The admission of prior bad acts into evidence is harmless if "we are convinced that the error did not influence the jury, or had but very slight effect, and can say with fair assurance . . . that the judgment was not substantially swayed by the error." *United States v. Dennis*, 497 F.3d 765, 770 (7th Cir. 2007) (quoting *United States v. Torres*, 977 F.2d 321, 328 (7th Cir. 1992)).

The admission of the trespassing arrest, if it was an inadmissible prior bad act, did not bump the jury from an

acquittal to a conviction. Evidence of the prior trespass played only a minimal role in the seven-day trial. With respect to his conviction for distribution, Bethel still testified that Bailey brought him two ounces of crack on August 29, 2002. This alone would establish distribution. As for the conspiracy, the government introduced Bailey's phone records to show that he was in contact with Williams on August 29, 2002 to purchase crack. The phone records then show Williams calling Bailey, and Bethel's testimony establishes that Bailey ultimately arrived with the drugs. The evidence of Bailey's guilt is overwhelming, leaving no doubt that the jury would have reached the same decision with or without the trespassing arrest in evidence. *See United States v. Torres*, 977 F.2d 321, 328 (7th Cir. 1992) ("[A]ny error would be harmless because even without the . . . evidence the jury's verdict would almost certainly have been the same."). Nor was the trespass so damning as to have unduly prejudiced the defendant in the eyes of the jury. Therefore, the admission of Officer Feehan's testimony regarding the trespass arrests does not entitle Bailey to any relief.

### 3.  Bailey's Presence at the Drug Sales

Bailey also appeals the district court's decision to admit testimony that Bailey accompanied Williams on trips to Mickle's father's house for drug sales. John T. Williams testified that Bailey would accompany Shane Williams to purchase crack cocaine from Mickle. He said that Bailey would wait in the car, rather than join Williams inside because, as a Vice Lord, he was unwelcome in the home of a Black Disciple's father. On appeal, Bailey argues that this evidence was not probative of the conspiracy and that it was unduly prejudicial. Bailey characterizes his behavior as innocent and argues that it shows no involvement in the drug conspiracy.

Federal Rule of Evidence 402 provides that all relevant evidence is admissible. FED. R. EVID. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Where the admitted evidence fills a "chronological and conceptual void" in the government's case, it is relevant. *United States v. Pulido*, 69 F.3d 192, 202 (7th Cir. 1995) (quoting *United States v. Vretta*, 790 F.2d 651, 656 (7th Cir. 1986)). A district court can exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. Unfair prejudice occurs if the evidence "will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Pulido*, 69 F.3d at 202 (quoting *Vretta*, 790 F.2d at 655). This calculus falls squarely in the lap of the district court. This Court will disturb the district court's decision to admit evidence only when it abuses its discretion. *Id.* at 201.

The district court properly admitted the testimony. The fact that Bailey waited in the car was relevant to Bailey's involvement in Williams' drug purchases. The evidence established that Bailey was not unfamiliar with Williams' frequent visits to Mickle's father's home to purchase crack, which was the nature of the alleged conspiracy. Bailey is correct that sitting in the car and occasionally knocking on the door are otherwise innocent behavior. Mere presence does not prove a conspiracy. *United States v. Saadeh*, 61 F.3d 510, 525 (7th Cir. 1995). But when viewed in the context of Williams' drug purchases, this evidence is certainly relevant. Bailey's presence shows both an association between Bailey and Williams' illicit business and that Williams trusted Bailey enough to bring him along. Though not conclusive, Bailey's presence at these drug deals makes the existence of the conspiracy

"more probable." In addition, the evidence was not unfairly prejudicial. The prejudice that results from Bailey's presence at Williams' drug purchases is pretty clear. However, the testimony was unlikely to cause the jury to convict the defendant on an impermissible or emotional basis. It would not be irrational for a jury to conclude that Bailey was part of an ongoing conspiracy to distribute drugs based, in part, on his presence in the car during Williams' purchases. We therefore find no error in the district court's conclusion and affirm Bailey's conviction.

## C. Alexander's Appeal

Alexander only appeals his conviction for being a member of the drug-distribution conspiracy. He has never denied his involvement in the August 13, 2002 sale of crack to Bethel. Nor does Alexander deny that Bailey and Williams were involved in a conspiracy, saying that "overwhelming evidence" supports their convictions. But he does deny that sufficient evidence proves that he intended to join a conspiracy with Williams and Bailey to distribute drugs. We disagree.

Alexander may not have been the laboring oar in the conspiracy, but he was certainly rowing. The evidence established that Alexander would direct willing buyers to Bailey or Williams. Alexander thus served as an intermediary in the conspiracy, bridging the divide between a willing buyer and Williams or Bailey. *See United States v. Sachsenmaier*, 491 F.3d 680, 684 (7th Cir. 2007); *United States v. Rock*, 370 F.3d 712, 715 (7th Cir. 2004) ("Case law is clear that when defendants are on the same side of a sale of drugs to a third party, there is sufficient evidence of a conspiracy.").

The most obvious instance of Alexander's role was the August 13, 2002 sale. Bethel testified that he had called

Alexander around noon and asked if he could purchase an ounce of crack. A few hours later, Bethel called Alexander and asked how long it was going to take him to "grab that zip for me." Alexander responded that all he had to do was "make a phone call" and that he would "have them bring it over here, and I'll just come to the Taft with them." At around 5:00 P.M. that night, Alexander and Williams stopped by where Bethel was living and delivered the ounce. Although Bethel had purchased crack from Alexander three or four times in the past, he had never bought from Williams before. After the initial transaction, Alexander gave Williams' number to Bethel for him to call directly. Alexander also helped set up the August 29, 2002 transaction, serving as a bridge between Bailey and Bethel when the former was slow in making delivery. Throughout the day, Alexander was in contact with Bailey and Williams on their cell phones. Although the jury acquitted Alexander of a distribution charge for that day, his behavior is still relevant to whether he conspired to do so. *Billops*, 43 F.3d at 286.

This evidence clearly establishes Alexander's involvement as of August 2002, but his involvement stretches back much further. Alexander had worked with Bailey to sell drugs for years. Jason Parker testified that Alexander would purchase "ounces, half ounces, . . . two ounces of crack from" him beginning in 1994. He would deliver the drugs to Alexander and Bailey together at the Taft Homes "when their supply didn't have the drugs they needed." John T. Williams testified that Williams had Alexander and Bailey working for him out of Williams' house on Madison Street. Until he was sent to prison in 1997, John T. Williams would deliver ounces of crack to the house where Alexander was working for Williams, "dealing drugs and stuff like that." Finally, Mario Thompson testified that he had also sold smaller amounts of crack to Alexander during the months leading up to his

arrest in 2002, the same period in which he was supplying Williams. In short, the jury was entitled to believe that Alexander had formed an agreement with Williams and Bailey to sell drugs, based on the controlled buys to Bethel and the testimony establishing Alexander's involvement with Williams and Bailey in the Peoria crack market. The testimony certainly supported this conclusion. We will not disturb it on appeal.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the jury's verdicts for all three defendants and AFFIRM Williams' sentence.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*