In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3607

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL TAYLOR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 239—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED OCTOBER 30, 2012—DECIDED NOVEMBER 30, 2012

Before BAUER, FLAUM, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Over the course of two days in late November and early December 2009, defendant Michael Taylor went on a shooting spree in Aurora, Illinois. He fired his black 9 millimeter Beretta semi-automatic pistol (the "Beretta") on residential streets, at family homes, and at a moving vehicle, all in an apparent attempt to retaliate against rival gang members. Taylor was arrested and charged with possessing a

firearm after having previously been convicted of a felony. Before his jury trial, Taylor filed a motion *in limine* to exclude evidence of two other guns that officers had recovered at the scene of his arrest, and the district court denied that motion. After his trial, a jury found Taylor guilty of violating the felon-in-possession statute. Based in part on the violent circumstances of Taylor's crime and his extensive criminal history, the district court imposed a sentence of 480 months' imprisonment, which was nearly thirteen years above his advisory guideline range. Taylor filed a timely appeal, arguing that the district court erred in denying his motion *in limine*, that the government's evidence was insufficient to support the jury's verdict, and that the sentence imposed by the district court was substantively unreasonable. For the reasons set forth below, we affirm.

## I. Background

### A. The Shootings

The evidence presented at trial established that on November 28, 2009 Taylor, a convicted felon, was at a party in Aurora, Illinois with his cousin, Daniel Starks. During the party, a fight broke out between members of rival gangs. In the midst of the fight, the host, Derrick Smith, and his friend, Sean Parker, threatened to kill Starks. As Starks fled the party, he heard gunshots, which Taylor later told Starks he had fired out of concern for Starks's well-being. Later that evening and into the early morning hours of November 29, Starks, Starks' half-brother Javaris Yankaway, and Taylor's girlfriend rode

with Taylor in his white Cadillac to three locations in Aurora. In response to the events that had transpired at the party, Taylor fired shots from his Beretta toward an apartment complex, Smith's residence, and Parker's residence.

On December 1, 2009, Starks, Taylor, and Javaris were together at Starks's residence. Roosevelt Yankaway, who is Starks's father and Taylor's uncle, came over to the house and told the men that on the previous evening, shots had been fired at his house and that he thought the shooters were allied with Smith and Parker. Enraged, Taylor got into his Cadillac with the three men and began driving around Aurora. Taylor was in the driver's seat, Javaris was in the front passenger's seat, and Starks and Roosevelt were in the rear seats. According to Starks, both Taylor and Javaris were wearing gloves. Starks also noted the outline of a gun in Roosevelt's right pocket. Starks had previously seen Roosevelt with a .380 caliber Bersa handgun (the "Bersa"), and determined that the outline of the gun in Roosevelt's pocket was consistent with the size and shape of the Bersa.

Near the intersection of Fourth Street and Ohio Street in Aurora, Starks watched from the back seat as Taylor and Javaris fired shots out of the driver's window of the Cadillac in the direction of a passing blue Yukon SUV that the men had been tracking. According to Starks, Taylor was firing the Beretta and Javaris was firing a .357 revolver (the "revolver"). After the shooting, the four men fled the area in the Cadillac and drove toward

Roosevelt's residence. When they arrived in the neigh-borhood, they parked the car a few houses away and then approached Roosevelt's driveway.

## B. The Arrest

At the time of the shooting at Fourth Street and Ohio Street, Joselle Rosales was walking her dog near the intersection. Immediately after the shooting occurred, she called the police and reported having observed a shooting between a white Cadillac and a dark-colored SUV. She could not see into the Cadillac, but she told police that she heard multiple gunshots.

The Aurora Police Department ("APD") dispatched several officers to the scene to investigate the shooting. Officer Greg Spayth arrived within minutes of Rosales's call. He blocked the streets and collected and reviewed evidence. During his investigation, Officer Spayth ob-served two shell casings near the intersection of Ohio Street and North Avenue, one block north of where the shooting reportedly occurred. He also observed bullet holes in two separate residences located near the inter-section of Ohio Street and North Avenue.

After hearing the dispatch and the information about the white Cadillac, APD Officers Damien Cantona, Robert Hillgoth, and David Tellner, who were together in a single vehicle, traveled to Roosevelt's residence. On the previous evening, officers from the APD had re-sponded to a report of gunshots at Roosevelt's residence, and the officers who investigated that shooting had

observed a light-colored Cadillac parked in the drive-way next to the house. Based on the shooting at Roosevelt's residence the night before and the informa-tion about the involvement of a white Cadillac, the dis-patched officers believed that the shooting at Fourth Street and Ohio Street could have been a retaliatory act.

When the officers arrived at Roosevelt's residence on Union Street, they observed three individuals, later identified by police as Taylor, Javaris, and Roosevelt, standing near a light-colored Cadillac on the driveway. Upon seeing the police, the individuals fled. All three ran across the backyard toward the property south of Roosevelt's residence ("Property A"). Having recognized Roosevelt, Officer Hillgoth yelled, "Roosevelt, stop, police," and began to chase the men on foot through the backyard. Officer Hillgoth continued onto the backyard and driveway of Property A, where he found Roosevelt crouched behind a parked vehicle. During Roosevelt's arrest, the other two officers observed Taylor and Javaris walking from the backyard adjacent to the south end of Property A ("Property B") and toward a white Cadillac parked nearby. Officer Cantona ap-proached the two men and handcuffed them. Starks had fled from the scene immediately upon seeing police, heading west away from Union Street and then north. He successfully escaped, but was later arrested.

After officers detained Taylor, Javaris, and Roosevelt, investigators who had arrived at the scene performed gunshot residue ("GSR") tests on the hands of the three men. An APD officer also tested the interior of the white

Cadillac for GSR. Meanwhile, Officer Cantona searched the area where the chase had occurred and found the Bersa under the tire of the vehicle near where Roosevelt had been hiding. He also found the revolver near the location of Javaris's arrest. Finally, in the backyard of a third property, which was immediately adjacent to the western side of Property B ("Property C"), Officer Cantona located the Beretta and the Beretta's magazine.

Following the arrests, experts analyzed the recovered evidence. A forensic expert determined that the sample that had been collected from Taylor's left hand just hours after the shooting tested positive for the presence of GSR and that the tests on Javaris's and Roosevelt's hands were negative. Another forensic expert concluded that the interior, front and back of the driver's side of the white Cadillac also tested positive for GSR. Although a fingerprint specialist found no latent prints on the Beretta, spent shell casings recovered from the locations of the shootings indicated that the Beretta had been fired. Deputy Kevin Kleveno, who responded to the scene of a reported shooting at Smith's residence on November 29, recovered two spent 9 millimeter shell casings at nearby Family Dollar Store. Officer Kurt Thomas, who responded to a different call regarding shots fired at an apartment complex in Aurora on the same day recovered four spent shell casings at that location. A forensic expert specializing in firearm identification concluded that the shell casings recovered from the two locations on November 29 and from the scene

of the shooting on December 1 had been shot from the Beretta.

## C.  The Trial

Taylor was charged with one count of possession of a firearm after having previously been convicted of a felony. Before his jury trial, Taylor filed a motion *in limine* to exclude evidence of the revolver and the Bersa that officers had recovered from the scene of the chase on December 1. He argued that the government was offering evidence of the two additional firearms only to show that he committed other bad acts. The district court disagreed and stated:

> The [Bersa] and the [revolver] are directly relevant to showing that it was more probable that Taylor, and not other individuals arrested with him, possessed the Berretta (sic) because the other individuals arrested with Taylor possessed [the other firearms]. The fact that the other individuals possessed those firearms makes it more likely that the third gun, the Berretta (sic), was possessed by Taylor as charged in this case. Taylor has not shown that the jury will be mislead (sic) or confused into believing that he possessed the [Bersa] and [the revolver]. Nor has Taylor shown that the [other firearms] should be excluded under Rule 403 or 404(b).

The district court denied Taylor's motion and ruled that the evidence of the Bersa and the revolver could be admitted at trial.

During the trial, Starks testified about Taylor's pur-
chase of the Beretta, about the shootings on November 28,
which lasted into the early hours of November 29, and
about the shooting on December 1. Officers had arrested
Starks sometime after December 1, and at a government
interview in January 2010, Starks initially testified that
he had no knowledge of the events that had occurred
on December 1. Starks later became a cooperating witness,
but at trial, he admitted to additional lies he told the
government and the grand jury. Starks also admitted to
abusing drugs and alcohol, testifying that he smoked
seven marijuana cigars and drank several shots of
cognac each day. He agreed that he would forget "small
things" when he drank and smoke and explained that
the combination of the drugs and alcohol had a
tendency to make him "goofy" and "joke around." Al-
though Starks admitted to being nervous on the witness
stand, he denied being either high or drunk in court.

The government put several other witnesses on the
stand during the trial to corroborate Starks's testimony.
The arresting officers testified about Taylor's flight and
about the recovery of the Bersa, the revolver, and the
Beretta from the scene of the chase. Officer Spayth
testified about the shell casings recovered near the scene
of the shooting at Fourth Street and Ohio Street on Decem-
ber 1, and Officer Thomas and Deputy Kleveno testified
about the shell casings recovered from the store near
Smith's residence and the apartment complex on Novem-
ber 29. Forensic experts confirmed that the shell casings
recovered from those three locations had originated
from the Beretta, that only Taylor's left hand tested posi-

tive for GSR, and that the entire driver's side of the white Cadillac tested positive for GSR. Finally, Rosales testified that she saw shots fired from the white Cadillac on December 1.

After hearing the evidence, the jury found Taylor guilty of violating 18 U.S.C. § 922(g)(1), and the district court denied his motion for acquittal.

### D. Sentencing

The district court sentenced Taylor on November 10, 2011. The probation officer recommended a base offense level of 34 and calculated a total of 23 criminal history points, putting Taylor in criminal history category VI. Based on these recommendations, Taylor's advisory guideline range was 262 to 327 months. Taylor was also subject to the Armed Career Criminal Act's minimum term of fifteen years' imprisonment. At sentencing, the government argued that Taylor's offense conduct and criminal history warranted an upward variance from the guideline range as calculated in the PSR pursuant to U.S.S.G. §§ 4A1.3(a)(4)(B), 5K2.6, and 5K2.14. The government emphasized that Taylor had previously been convicted of several violent felonies, including aggravated battery, robbery, aggravated domestic battery, and domestic battery, and that the conduct in this case was consistent with his pattern of violence. The district court agreed with the government's assessment and after explaining its reasoning and considering the factors in 18 U.S.C. § 3553(a), the court sentenced Taylor to 480 months' imprisonment.

## II. Discussion

### A. Admissibility of the Two Additional Guns

Taylor argues that the district court erred in admitting evidence of the revolver and the Bersa that officers recovered from the scene of Taylor's arrest and attributed to Javaris and Roosevelt—neither of whom were charged. He contends that the evidence of the additional firearms was inadmissible under Federal Rules of Evidence 404(b) and 403. We review a district court's evidentiary rulings for abuse of discretion, recognizing that a district court has "wide discretion" in ruling on the admissibility of evidence. *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quoting *United States v. Hall*, 165 F.3d 1095, 1117 (7th Cir. 1999)). The district court's ruling will be reversed "[o]nly where no reasonable person could take the view adopted by the trial court." *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008).

Here, the district court concluded that the revolver and the Bersa were directly relevant to showing that it was more probable that Taylor, and not the other individuals arrested with him, possessed the Beretta. The court concluded that if Javaris and Roosevelt possessed their own guns, it would be more likely that Taylor possessed the third gun. The court also determined that Taylor had not shown that the evidence would mislead the jury in any way.

Taylor argues that the jury could have mistakenly believed that the guns belonged to him, rather than to Javaris and Roosevelt, and that the evidence was therefore inadmissible propensity evidence. Rule 404(b)

states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). Here, the government did not offer the evidence at issue in an attempt to show that Taylor possessed the other two guns, thereby making it more likely that he possessed the gun in question. Instead, the government used the evidence to show that two of the other people with Taylor possessed firearms of their own and that it was therefore less likely that someone else with Taylor possessed the Beretta. The language of Rule 404(b) does not apply to crimes, wrongs, or acts of another person. Thus, the only question is whether the evidence was unduly prejudicial under Rule 403.

Federal Rule of Evidence 403 allows the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This rule requires the district court to balance the probative value of the evidence at issue against any potential harm its admission might cause. *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011). Here, the evidence regarding the recovery of the revolver and the Bersa was probative of Taylor's guilt in two ways. First, as the district court concluded, the fact that the other individuals arrested with Taylor possessed guns of their own makes it less likely that those individuals possessed the Beretta and more likely that the Beretta

was in Taylor's possession. Second, the evidence of the other guns corroborated Starks's eyewitness testimony regarding the December 1 shooting. At trial, Starks testified that he had observed Taylor in possession of the Beretta on various occasions, including during the December 1 shooting that occurred just prior to Taylor's arrest. Starks also testified that Javaris fired the revolver and that Roosevelt possessed the Bersa during the December 1 shooting. The fact that Officer Cantona recovered those guns in close proximity to their alleged possessors supports Starks's testimony.

Taylor argues that even if the evidence is relevant it should have nonetheless been excluded because it revealed that officers recovered guns from other individuals closely related to him. He does not develop this argument and does not explain why the purported prejudicial effect would outweigh the probative value of the evidence. Importantly, the question under Rule 403 is not whether the evidence of the two additional firearms would have been prejudicial to Taylor, but rather whether it would have been unfairly prejudicial. As noted above, the evidence of the guns was highly probative of the fact that Taylor, and not one of the other two men, possessed the Beretta, and the evidence also served to corroborate Starks's eyewitness testimony. Thus, even if the evidence suggested that Taylor associated with individuals who possessed guns, any potential prejudice was outweighed by the guns' probative value. The district court did not abuse its discretion when it denied Taylor's motion *in limine*.

**B.  Sufficiency of the Evidence at Trial**

Next, Taylor argues that the government's evidence was insufficient to sustain his felon-in-possession conviction. In reviewing a conviction for the sufficiency of the evidence, we consider the evidence in the light most favorable to the government. *United States v. Gorman*, 613 F.3d 711, 715 (7th Cir. 2010). Because it is the jury's exclusive function to evaluate the credibility of witnesses and to draw reasonable inferences from the evidence, we will not weigh the evidence on our own or "second-guess the jury's credibility determinations." *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006) (quoting *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001); *see also United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir. 1995). Thus, "a jury's verdict will be upheld if any 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Melendes*, 401 F.3d 851, 854 (7th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

To sustain a conviction under 18 U.S.C. § 922(g)(1), the government must prove (1) that the defendant had a prior felony conviction; (2) that the defendant possessed a firearm; and (3) that the firearm traveled in or affected interstate commerce. *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003). Taylor does not dispute the fact of his previous felony conviction or that the firearm in question traveled in interstate commerce, but he contends that the government did not provide sufficient evidence for the jury to conclude that he had possession of the firearm beyond a reasonable doubt.

Here, the government presented direct evidence of Taylor's possession of the Beretta. Starks testified that Taylor fired shots from the Beretta in the direction of a blue Yukon. Several forensic experts corroborated Starks's testimony by explaining that Taylor was the only person arrested to have GSR on either of his hands, that the inside driver's side of the Cadillac tested positive for GSR, and that the casings recovered from various locations where Starks testified he had observed Taylor firing the Beretta had come from the Beretta. The arresting officers' testimony about Taylor's flight from the police and the location of the Beretta further corroborated Starks.

Taylor argues that the government's case rests entirely on Starks's testimony and that Starks's "mass consumption of cannabis and alcohol would make any recall of the detail he provides completely impossible." But the jury in this case had the opportunity to observe Starks's "verbal and nonverbal behavior" and account for any "confused or nervous speech patterns." *See United States v. Eddy*, 8 F.3d 577, 582-83 (7th Cir. 1993) (internal quotation marks omitted) (contrasting the trier of fact's ability to make a credibility determination with the appellate court's ability, which is based solely on the "cold pages of an appellate record"). To find a witness's testimony to be incredible as a matter of law, it must have been "physically impossible for the witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007) (internal quotation marks omitted). Even if Starks had

been under the influence of drugs and alcohol on the evening of December 1, he could still have observed the events as he testified they occurred. And although it is possible that Starks's excessive use of marijuana and alcohol has had an effect on his cognition and memory, Taylor presented evidence on this point, allowing "the jury to evaluate the credibility of the witness[ ], including any cloudiness brought on by [his] drug use." *Id.* In this case, the evidence viewed in the light most favorable to the government is sufficient to support a finding of possession for the purpose of a conviction under 18 U.S.C. § 922(g)(1).

## C.  Substantive Reasonableness of the Sentence

Taylor's final argument is that the 480-month sentence imposed by the district court—a sentence which is almost thirteen years beyond the high end of his guideline range—is substantively unreasonable. We review a district court's sentencing decision for reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007). "We will uphold an above-guidelines sentence so long as the district court offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a), for imposing such a sentence." *United States v. Abebe*, 651 F.3d 653, 657 (7th Cir. 2011) (quoting *United States v. Aldridge*, 642 F.3d 537, 544 (7th Cir. 2011)). Sentences outside of the guideline range are not presumptively unreasonable, *id.*, but a major departure from the guideline range must be supported by a more significant justification than one supporting a minor departure. *Gall*, 552 U.S. at 50.

During Taylor's sentencing hearing, the district court provided a comprehensive explanation of its decision to impose a sentence above Taylor's guideline range. It noted its consideration of all of the factors in 18 U.S.C. § 3553(a) and discussed Taylor's troubled childhood and addiction to illegal drugs and alcohol. Then, it addressed the government's motion for an upward variance, in which the government argued that the court should consider Taylor's offense level to be 37 rather than 34 based on the severity of his conduct and the guidelines' underrepresentation of his criminal history. The court accepted the government's argument and cited three sections of the guidelines in support of the upward variance. First, the court explained that § 4A1.3 of the guidelines provides for an upward variance if "the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history." U.S.S.G. § 4A1.3. The court noted that in this case, Taylor's criminal history points added to nearly double the number needed to qualify for the highest criminal history category of VI and that his criminal history included several violent crimes. Moreover, the court explained that some of Taylor's past convictions were not assigned criminal history points because they were outside of the applicable time frame. Next, the court addressed § 5K2.6, which provides that the discharge of a firearm during the commission of a crime "might warrant a substantial sentence increase." U.S.S.G. § 5K2.6. The court concluded that the government had shown during the course of the trial that Taylor discharged his firearm in the direction of individuals' homes and moving vehicles. Finally, the court discussed § 5K2.14, which

states that a court may apply a sentence above the guide-lines range "[i]f national security, public health, or safety was significantly endangered," because of the defendant's actions. U.S.S.G. § 5K2.14. The court explained that Taylor had engaged in a shooting spree in public areas in an attempt to retaliate against other gang members and that by doing so, he endangered public safety.

The district court discussed at length the violent nature of Taylor's offense as well as his extensive criminal history, and it explained the ways in which the guideline range did not adequately reflect the serious-ness of the offense. The district court classified Taylor's conduct as "egregious" and emphasized the need to deter gang members and other individuals from pos-sessing guns illegally. A sentence that requires a defendant to serve 153 months above the guideline range for a felon-in-possession conviction is undoubtedly a harsh sentence. But we are not presented with a case in which the court's rationale for the above-guidelines sentence "provides little more than what is implicit in the instant offense." *See United States v. Bradley*, 675 F.3d 1021, 1025 (7th Cir. 2012) (concluding that the district judge did not provide "sufficient justification" for imposing a sentence 169 months above the guidelines range). Taylor did not just possess a firearm. He went on a shooting spree and fired several shots at multiple resi-dences and at a vehicle in an attempt to retaliate against rival gang members. The district judge concluded that Taylor had shown complete disrespect for the law by collecting nearly double the maximum number of criminal history points that are considered under the

guidelines. A district court must provide a significant justification to support a major departure from the guidelines, but the justification need not be extraordinary. *United States v. Brown*, 610 F.3d 395, 398 (7th Cir. 2010) (internal quotation marks omitted). The district court's explanation of its sentencing determination reflects a serious consideration of the factors in § 3553(a), and under an abuse-of-discretion standard, we must give deference to the district court's determination that the factors justify a 480-month term of imprisonment in this case.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's evidentiary ruling, AFFIRM the jury's verdict, and AFFIRM the sentence imposed by the district court.