In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2245

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

NIKOLE SAKELLARION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 922-6—**Elaine E. Bucklo**, *Judge.*

ARGUED JANUARY 18, 2011—DECIDED AUGUST 19, 2011

Before TINDER and HAMILTON, *Circuit Judges*, and
MURPHY, *District Judge.**

TINDER, *Circuit Judge*. Nikole Sakellarion was involved
in cocaine distribution in the Chicago area. To her credit,
when her drug activity came to the attention of law
enforcement authorities, she provided substantial assis-

---

* The Honorable G. Patrick Murphy of the Southern District
of Illinois, sitting by designation.

tance to the investigators to implicate other drug distributors in exchange, of course, for a favorable plea agreement. That agreement required the government to recommend, and if accepted, the court to impose a sentence about half as long as Sakellarion faced under a mandatory minimum sentencing provision. The district judge accepted the agreement, which contained a waiver of Sakellarion's right to appeal, and the agreed-upon sentence was imposed. Nonetheless, Sakellarion appeals, complaining not about the sentence she received, but rather about the fact that she did not receive an even more favorable sentence that she had hoped to receive as a result of a supplemental agreement negotiated after she pled guilty under the original plea agreement. She contends that the government acted in bad faith in not fulfilling this agreement to amend the original plea agreement. But we cannot review her complaint about the supplemental agreement because Sakellarion's original plea agreement contained a waiver of her right to appeal. Because Sakellarion never sought to withdraw her plea of guilty entered under that agreement, we have nothing to review. We must enforce the plea agreement's appellate waiver and dismiss Sakellarion's appeal.

## I. Background

In the summer of 2006, George Chavez asked Sakellarion to act as a cocaine sales intermediary between himself and his customer Hector "Jerry" Cruz. Chavez and Cruz had suffered a falling-out of sorts. So for the next three

or four months, Chavez gave Sakellarion at least 4.5 ounces of powder cocaine about twice a week, typically from Chavez's Chicago home. Sakellarion then gave Cruz the cocaine. Sometimes Sakellarion moved 9 or 10 ounces of cocaine, occasionally buying an ounce for herself and distributing the rest to Cruz. In exchange, Cruz cooked powder cocaine into crack for Sakellarion or gave her a discounted price on his crack cocaine. Sakellarion also purchased about an ounce or a half-ounce of crack cocaine from Cruz at least twice a month for about a year. Sakellarion also purchased similar quantities of crack cocaine from Chavez about five times in 2006. Sakellarion sold the drugs to her own customers. Sakellarion admitted to distributing about 2.5 kilograms of cocaine and about 570 grams of crack cocaine.

Sakellarion was indicted on March 8, 2007, along with Chavez and five others, for conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of mixtures and substances containing cocaine, and 50 grams or more of mixtures or substances containing cocaine base in the form of crack cocaine. *See* 21 U.S.C. §§ 846, 841(a)(1). The indictment alleged that the conspiracy centered around Chavez's "Paintball Explosion" business that served both as a front for cocaine sales and a laundry for the cash proceeds. Sakellarion began cooperating with federal drug investigators as soon as she was arrested on the federal charges, and in fact, she actually began her cooperation with law enforcement before that by working with local police officers when she was arrested by them on a cocaine charge. (Conversations she recorded with Cruz for the local police

were simultaneously recorded on a Title III wiretap.) Sakellarion eventually signed a written plea agreement, binding under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, which, if accepted by the court, required it to impose a sentence that would be 50% less than the low end of the sentencing guidelines or the statutory minimum, whichever was greater. The agreement noted that the court's authority to impose a sentence below any mandatory minimum would arise from the government's recognition of her assistance to the investigation pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). The district court accepted Sakellarion's guilty plea on July 25, 2008, reserving only the question of whether the judge would also accept the parties' agreement on the sentence to be imposed. No complaint is raised about the adequacy of the guilty plea hearing, nor does Sakellarion contend that she did not understand any aspect of the terms of her plea agreement.

The Presentence Investigation Report (PSR) set Sakellarion's base offense level at 34 based on the type and amount of drugs involved in the offense, and credited her a 3-level reduction pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility. The PSR also projected Sakellarion's criminal history point total at 2 based on two prior convictions, one point for a battery conviction in 2000 and the other for a theft conviction in 2003. If both convictions counted, Sakellarion's criminal history category would be II. This was a critical determination in the sentencing process and it is where Sakellarion and the government parted ways. Sakellarion

contended that the 2000 disposition (based on a guilty plea) only involved traffic offenses and not a battery conviction, and thus should not count for any criminal history points. Sakellarion's view would leave her with only 1 point in her criminal history and place her in the lower criminal history category I; more importantly, it would also allow her to be eligible for the "safety valve" reduction of two levels from her offense level. *See* 18 U.S.C. § 3553(f); U.S.S.G. §§ 2D1.1(b)(11), 5C1.2(a) (2009). The "safety valve" would result in a guideline incarceration range of 87-108 months (offense level 29, criminal history category I); with no "safety valve," the range was 121-151 months (offense level 31, criminal history category II). (Keep in mind that the plea agreement would yield her a sentence of one-half of the lower end of those ranges.) Sakellarion contended that she only remembered pleading to traffic-related offenses. But the government maintained that the information in the PSR about the battery conviction was correct. What followed was a series of hearings intended to resolve the dispute about that prior conviction. Yet even after Sakellarion's counsel obtained a transcript of the 2000 state court proceeding, the parties disputed its meaning. At a September 29, 2009, sentencing hearing, the district court indicated that it agreed with the government's reading of Sakellarion's criminal history. Sakellarion requested a continuance of the hearing to allow time to attempt to renegotiate her plea deal. Also at that hearing, Pretrial Services reported that Sakellarion had recently tested positive for marijuana. Sakellarion denied using marijuana and asserted that

the test result could not have been correct. The sentencing was continued until December of that year.

The parties never agreed on the safety valve but, despite the positive drug test, the government did agree to renegotiate the sentence portion of Sakellarion's plea agreement so Sakellarion would receive a 43-month sentence. This would be the same sentence she would have received if the safety valve had applied under the original plea agreement. But at the December 15, 2009, hearing, the Assistant U.S. Attorney (AUSA) reported that although the government "had agreed to a lesser sentence" of 43 months, Sakellarion tested positive again—this time for some type of opiate. The AUSA said that he would see whether this second positive changed whether the government could "go forward with an amended plea agreement," a draft of which he had already given to Sakellarion's counsel. Sakellarion again denied drug use and said she would pay to have her hair tested to prove it. The district court postponed the matter to give the AUSA an opportunity to confer with his supervisors to assess the accuracy of the drug testing procedures and to determine whether to proceed with the 43-month deal. At a March 18, 2010, hearing, the AUSA told the court that the government needed more time to determine whether there was evidence of false positives in Sakellarion's case and in general and to decide whether to "go forward with an amendment to the plea agreement."

At the continuation of the sentencing hearing on May 18, 2010, the AUSA told the court that Sakellarion

tested positive a third time (this time for morphine) and "as far as we are concerned, it's over." The AUSA asserted that the testing procedures used by the Probation Office of the court were reliable and that the testing facility's employees received regular training. He also reported that due to Sakellarion's positive drug tests, the government declined to go through with any amendment to the plea agreement previously filed with the court. Sakellarion challenged the prior "opiate" test's reliability because it was based on a urine sample and that the testing facility's employees were only trained annually through nothing more than a PowerPoint presentation. Counsel for Sakellarion argued that her client's negative "hair strand" test was more reliable and she offered that her client, at her own expense, would take another "hair strand" test to refute the most recent morphine result. Sakellarion argued that although the government had discretion in whether to amend her plea agreement, it could not act "arbitrarily and capriciously" and that it was doing so by refusing to reject the test results from Pretrial Services and further retracting its offer to improve the bottom-line sentence recommendation contained in the original agreement. The district court found that Sakellarion failed to prove defects in the testing procedures used by Pretrial Services or that the government was not acting in good faith. The court declined to continue the sentencing for the purpose of any additional drug testing by the defense and proceeded to conclude the sentencing hearing that had begun many months before. The AUSA moved for the 50% downward departure from the statu-

tory mandatory minimum based on Sakellarion's co-
operation from "the get-go" and did not back down
from the recommendation in the plea agreement that
Sakellarion be allowed the full reduction of 3 levels for
acceptance of responsibility, despite the adverse pretrial
release drug test results. Sakellarion did not seek to
withdraw her guilty plea. Thus, the court sentenced
Sakellarion pursuant to the original plea agreement
and imposed a sentence of 60 months' imprisonment
followed by a period of supervised release and $100
special assessment. Sakellarion filed a timely appeal from
that sentence.

## II. Analysis

Sakellarion's plea agreement contains the following
waiver of her right to appeal:

> Defendant further understands she is waiving
> all appellate issues that might have been available
> if she had exercised her right to trial. Defendant
> is aware that Title 18, United States Code, Sec-
> tion 3742 affords a defendant the right to appeal
> her conviction and the sentence imposed. Ac-
> knowledging this, if the government makes a
> motion at sentencing for a downward departure
> pursuant to Sentencing Guideline § 5K1.1, defen-
> dant knowingly waives the right to appeal her
> conviction, any pre-trial rulings by the Court, and
> any part of the sentence (or the manner in which
> that sentence was determined), including any
> term of imprisonment and fine within the maxi-

mums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives her right to challenge her conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

The government seeks this provision's enforcement through the dismissal of Sakellarion's appeal. We have repeatedly held "that a voluntary and knowing waiver of an appeal is valid and must be enforced." *United States v. Sines*, 303 F.3d 793, 798 (7th Cir. 2002); *see also United States v. Woods*, 581 F.3d 531, 533-34 (7th Cir. 2009); *United States v. Hare*, 269 F.3d 859, 860-61 (7th Cir. 2001). We enforce appellate waivers when their "terms are express and unambiguous, and the record shows that the defendant knowingly and voluntarily entered into the agreement." *United States v. Aslan*, ____ F.3d ____, Nos. 08-1486, 08-1678, 08-3789 & 08-4136, 2011 WL 1793759, at *6 (7th Cir. May 12, 2011). Of course, if a plea agreement is unenforceable, "the waiver falls with the agreement." *United States v. Mason*, 343 F.3d 893, 894 (7th Cir. 2003); *see also Hare*, 269 F.3d at 860 (noting that we do not enforce appellate waivers in "annulled" agreements). A defendant may void a plea agreement in certain circum-

stances, such as a material breach by the government, *see United States v. Quintero*, 618 F.3d 746, 751-52 (7th Cir. 2010), or if the defendant pled guilty involuntarily, *see Mason*, 343 F.3d at 894. Sakellarion does not argue that her plea was involuntary or that the agreement, other than its appellate waiver, is unenforceable. Indeed, Sakellarion neither filed a motion at the district court to withdraw her guilty plea nor does she argue on appeal that the district court's decision to accept her plea agreement was somehow plainly erroneous. *See United States v. Thomas*, 639 F.3d 786, 788 (7th Cir. 2011) (enforcing an appellate waiver because the district court's decision to accept the plea agreement was not plainly erroneous). Sakellarion also does not argue that her appeal is outside the scope of the appellate waiver. *See, e.g., Aslan*, 2011 WL 1793759, at *6. Instead, Sakellarion alleges that the government acted in bad faith in withdrawing from its agreement to amend, that is, improve, her plea agreement. This bad faith, Sakellarion argues, breached her original plea agreement, cancelling the appellate waiver, but apparently not the rest of the plea agreement.

We have long held that an appellate waiver "stands or falls with the rest of the bargain." *United States v. Whitlow*, 287 F.3d 638, 640 (7th Cir. 2002); *see also Nunez v. United States*, 546 F.3d 450, 454 (7th Cir. 2008) (citing *United States v. Wenger*, 58 F.3d 280 (7th Cir. 1995)). When a district court rejects a defendant's allegations that the government acted in bad faith in breaching a plea agreement, the defendant may not circumvent the agreement's otherwise valid appellate waiver by ap-

pealing the bad faith ruling. *See Whitlow*, 287 F.3d at 640. Stated otherwise, a mere "*claim* of breach" does not void a waiver because that would make all appellate waivers unenforceable as "talk is cheap." *Id.* Thus, because Sakellarion's plea agreement with its waiver of her appellate rights remains an enforceable agreement between herself and the government, its appellate waiver requires us to dismiss her appeal.

Even if Sakellarion succeeded in having her guilty plea set aside, *see Hare*, 269 F.3d at 860-61, her options for appellate review would be quite limited. If ultimately convicted, Sakellarion could have sought review of her bad faith allegation but such challenges have proven difficult, *see, e.g.*, *Wade v. United States*, 504 U.S. 181, 185-86 (1992) (limiting review of a refusal to file a substantial assistance motion for unconstitutional motives such as race, religion, or lack of a rational relationship to legitimate state objectives); *United States v. Deberry*, 576 F.3d 708, 711 (7th Cir. 2009) (finding reasonable the government's refusal to file a motion to reduce based on an appellate waiver request), *cert. denied*, 130 S. Ct. 2060 (2010); *United States v. Miller*, 458 F.3d 603, 605 (7th Cir. 2006) (finding the government's refusal to file a substantial assistance motion because the government did not believe the defendant was forthcoming rationally related to a government objective), although not insurmountable, *see United States v. Wilson*, 390 F.3d 1003, 1012-13 (7th Cir. 2004) (finding that conditioning the filing of a Rule 35(b) motion on the defendant's dropping of an unrelated civil suit to be in bad faith and lacking a legitimate government objective). Sakellarion's success

in challenging the government's withdrawal from the supplemental agreement as a violation of her right to due process (as suggested at oral argument) seems even more questionable, *see, e.g.*, *Mabry v. Johnson*, 467 U.S. 504, 509-10 (1984) (permitting challenge of a guilty plea under the Due Process Clause only when "not fairly apprised of its consequences" or an "unfulfilled promise"), *partially abrogated by Puckett v. United States*, 556 U.S. 129, 129 S.Ct. 1423, 1430 n.1 (2009), because the timing of the government's agreement to amend her original plea agreement meant that it could not have prompted her to plead guilty and she fails to suggest what other detrimental reliance she suffered as a result of the government's agreement to amend, *see United States v. Traynoff*, 53 F.3d 168, 171 (7th Cir. 1995) (assuming that we must hold the government "to its agreements that reasonably cause criminal defendants to take other damaging actions"). But Sakellarion makes no such argument, perhaps because the supplemental agreement did not require her to do anything she had not already done. It seemed to be simply an effort by the parties to find a way to get her the benefit of the "safety valve" when in fact she was not entitled to it.

We must also note that attempting to set aside her guilty plea would have been quite risky if somehow successful. Judicial review of decisions involving plea agreements is quite limited because of the government's significant discretion over matters constitutionally assigned to the executive branch. *See, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985) ("[T]he Government retains 'broad discretion' as to whom to prosecute." (quoting

*United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)));
*United States v. Scott*, 631 F.3d 401, 406 (7th Cir. 2011)
(noting that prosecutorial discretion arises out of
Article II, section 3 of the Constitution, which assigns
the executive branch the duty to "take Care that the
Laws be faithfully executed"); *United States v. Christian*,
342 F.3d 744, 748-49 (7th Cir. 2003) (holding that
judicially estopping the government from charging the
appellant with a felony because his co-defendants were
charged with misdemeanors for the same incident would
"obliterate the usefulness of plea agreements"); *Rodriguez
v. Peters*, 63 F.3d 546, 563 (7th Cir. 1995) (refusing "to
second-guess the State's Attorney's exercise of discretion
in deciding not to prosecute [a cooperating co-gang
member] for murder"). To challenge the denial of the
supplemental agreement, Sakellarion would have to risk
giving up the very favorable treatment she was given in
the original plea agreement. That could be a large
sacrifice with a low potential for success. (This is
especially true because the district judge rejected the
allegation of bad faith after considering the facts
proffered to her.) But Sakellarion did not seek to
withdraw from her plea or from the original plea agree-
ment and the waiver of her right to appeal still stands.

Therefore, Sakellarion's appeal is DISMISSED.