In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-3748, 12-3750, 12-3781, and 12-3787

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JANET HALLAHAN and
NELSON G. HALLAHAN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Central District of Illinois.
Nos. 12-CR-10054 and 99-CR-10045 — **Joe Billy McDade**, *Judge.*

ARGUED JANUARY 10, 2014 — DECIDED MARCH 7, 2014

Before FLAUM and EASTERBROOK, *Circuit Judges*, and
GRIESBACH, *District Judge.**

GRIESBACH, *District Judge*. Defendants-Appellants Janet and
Nelson Hallahan engaged in a prolonged fraud that bilked
investors out of more than $1,000,000. They pled guilty, as part

---

* Of the Eastern District of Wisconsin, sitting by designation.

of plea agreements, to two counts of conspiracy. Rather than face sentencing for their crimes, the defendants chose to flee the district. They remained on the run for twelve years. After they were finally arrested, both pled guilty without a plea agreement to the additional crime of failing to appear for sentencing. At their long-delayed sentencing in 2012, the district court imposed above-guideline sentences of 270 months on Nelson Hallahan and 195 months on Janet Hallahan. They now challenge their sentences on a variety of grounds, despite having waived their rights to appeal in their original plea agreements. We affirm.

## I. BACKGROUND

On January 6, 2000, the defendants pled guilty to conspiracy to commit mail and bank fraud, in violation of 18 U.S.C. §§ 371, 1341, and 1344, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as part of plea agreements. The charges stemmed from their actions beginning in 1993 or earlier until 1999, during which time they convinced individuals to provide loans ostensibly for Janet Hallahan's tanning business. As a result of these acts, they were charged with sixteen counts of mail fraud, nine counts of money laundering, and three counts of bank fraud, in addition to the conspiracy charges. In exchange for their guilty pleas on the conspiracy counts, the government agreed to move to dismiss the other charges, not bring additional charges related to the offenses, recommend a downward adjustment for acceptance of responsibility, and recommend a sentence at the low end of the applicable guideline range. The plea agreements also included appeal waivers:

> [T]he defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742 or on any ground whatever, in exchange for the concessions made by the United States in this plea agreement.

After a full and complete plea colloquy in accordance with Rule 11 of the Federal Rules of Criminal Procedure, the district court accepted both pleas, finding that Janet and Nelson Hallahan were competent to enter their pleas and did so knowingly and voluntarily.

The defendants were scheduled to be sentenced on May 4, 2000, but they did not appear. Instead, the defendants chose to flee. The probation office discovered the defendants had absconded on January 18, 2000—just twelve days after they pled guilty. For the next twelve years, they eluded justice while living in Missouri and Arizona. They were arrested on May 12, 2012, in Arizona, where they were residing under false names. Upon their return, Janet and Nelson Hallahan were charged with, and pled guilty to, willfully failing to appear for sentencing, in violation of 18 U.S.C. § 3146(a)(1).

On November 28, 2012, the district court finally sentenced Janet and Nelson Hallahan on the conspiracy and failure to appear counts. Both Janet and Nelson Hallahan argued that the court should use the version of the United States Sentencing Guidelines Manual (U.S.S.G. or Guidelines) that was in effect at the time of the offenses, rather than the version in effect at

the time of the sentencing, to avoid a violation of the Ex Post Facto Clause. The district court disagreed and calculated the advisory sentencing range using the 2012 Guidelines which were in effect at the time of sentencing, consistent with this Court's decision in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006). Based on the 2012 Guidelines, the district court calculated the advisory range to be 210 to 262 months for Nelson Hallahan and 135 to 168 months for Janet Hallahan. Under the 1998 Guidelines, which were in effect at the time of the offenses, the advisory range would have been 121 to 151 months for Nelson Hallahan and 97 to 121 months for Janet Hallahan.

After hearing arguments from all of the parties, including the government's request for the "longest of sentences," the district court imposed a sentence of 270 months on Nelson Hallahan and 195 months on Janet Hallahan based on its consideration of the sentencing factors under 18 U.S.C. § 3553(a). These sentences represented upward variances from the sentencing range under the 2012 Guidelines. Nelson and Janet Hallahan filed timely appeals. We consolidated the appeals on our own motion for purposes of briefing and disposition.

## II. ANALYSIS

On June 10, 2013, while these appeals were pending, the Supreme Court decided *Peugh v. United States,* ___ U.S. ___, 133 S. Ct. 2072, 2078 (2013), in which it abrogated this Court's decision in *Demaree* and held that the Ex Post Facto Clause is violated "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new

version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." In light of the Supreme Court's decision in *Peugh*, the defendants contend that the district court violated the Ex Post Facto Clause when it used the 2012 Guidelines in determining their sentences. They also argue that the district court incorrectly calculated the base offense level for the conspiracy to commit money laundering count, regardless of which version of the Guidelines applies, and that the district court failed to follow the procedure prescribed by the Guidelines for determining their sentences for the failure to appear counts. Janet Hallahan separately presents two additional challenges. First, she argues the district court erred when it failed to rule on her motion to withdraw from the appeal waiver provision of the plea agreement. Second, she contends that the district court's 195-month sentence was substantively unreasonable.

In response, the government has forcefully argued that the challenges related to the two conspiracy counts to which Nelson and Janet Hallahan pled guilty in 2000 are barred by the appeal waivers in their plea agreements. According to the government, even if the district court did err in applying the 2012 Guidelines or in calculating the base offense level for the money laundering offense, Nelson and Janet Hallahan bargained away their rights to appeal as part of valid and enforceable plea agreements. On the merits, the government argues that there is no ex post facto violation because, under the one-book rule, the latter version of the Guidelines applies when the earlier offense is grouped with a subsequent crime. The government concedes, however, that the base offense level was miscalculated on the money laundering count, but contends

that the district court correctly applied the Guidelines for the failure to appear count. As for Janet Hallahan's separate challenges, the government argues that the district court provided ample reasons to support her sentence and the district court's failure to rule on her motion to withdraw from the plea agreement is not reversible error because it has no chance of success on remand.

### A. Appeal Waivers

The parties have focused much of their attention on the enforceability of the appeal waivers contained in the plea agreements the defendants signed in 2000 when they pled guilty to the conspiracy counts. In response to the government's contention that they waived their rights to challenge the guideline calculation for the conspiracy offenses as part of their plea agreements, the defendants have argued that the appeal waivers are not enforceable. Regardless of whether they are enforceable, however, we conclude that the appeal waivers do not bar our review of the district court's guideline calculation on the conspiracy counts. This is because the district court used the same guideline to determine the defendants' sentences for the additional offense of failure to appear. As we explain below, all three offenses were, in Guidelines terminology, grouped, and therefore any error in the guideline calculation for the conspiracy counts necessarily affected the sentence imposed by the district court for the failure to appear count. Since the defendants did not waive their right to appeal when they entered their guilty pleas to that offense, they are entitled to review of the guideline calculations that were used as a starting point in the sentencing determination.

The issue of whether the waivers are enforceable is nevertheless relevant at least as to Janet, however, because she also challenges her sentence for the conspiracy offenses on substantive grounds. If her appeal waiver is enforceable, then her challenge to her sentence on those counts is barred. We therefore must determine whether the government is entitled to enforce Janet's waiver of her right to appeal. Before deciding that issue we turn first to Janet's claim that the district court committed plain error when it failed to rule on her motion to withdraw from the plea agreement. We decide that issue first, for if she should ultimately prevail on her motion, the appeal waiver does not apply to her in any event.

1. *Failure to Rule on Motion to Withdraw from the Plea Agreement*

After Janet and Nelson were arrested in Arizona, but before they were sentenced, Janet filed a motion to withdraw her guilty plea to the conspiracy counts and, alternatively, to withdraw from her plea agreement. Rule 11 requires "a fair and just reason" for withdrawing a guilty plea before sentencing. Fed. R. Crim. P. 11(d)(2)(B). Janet asserted that there were three fair and just reasons for the district court to permit her to withdraw her plea: (1) she was innocent of the charges; (2) her attorney provided ineffective assistance; and (3) she was coerced and intimidated into accepting the plea agreement by Nelson.

In support of her alternative request that she be allowed to withdraw from her plea agreement, Janet alleged that the reasons were "obvious" in that "[a]ll the benefits Ms. Hallahan sought from a plea agreement are no longer binding on the

Government or this court." She noted that the government would no longer be required to make recommendations for a three-level reduction to her offense severity score for acceptance of responsibility or for a sentence at the low end of the applicable guideline range. Janet also argued that the government would no longer be bound to dismiss the remaining counts in the indictment or refrain from filing additional charges based on the same course of conduct. Whereas the benefits she derived from the plea agreement had been lost, Janet noted that her appeal waiver remained. She explained that she wished to preserve her appeal rights to seek review of the district court's order and sentence in the event the court did not allow her to withdraw her plea or sentenced her under the current version of the Guidelines.

Relying on *United States v. Darnell*, 716 F.2d 479 (7th Cir. 1983), the district court summarily denied Janet's motion to withdraw her plea on the ground of laches. In *Darnell*, the defendant sought to withdraw his plea some twenty years after his conviction. Though the defendant alleged "a repugnant tale of violations of his constitutional and statutory rights," this Court found it unnecessary to determine the truth of the allegations and affirmed the district court's denial of the motion on the ground that "Darnell has not exercised reasonable diligence in ascertaining and presenting the asserted grounds for relief." *Id.* at 479–80. The Court identified two facts that justified the district court's conclusion that the motion was barred: (1) the government's ability to meet successfully the allegations of the motion or to present a case against the defendant if he was granted a new trial would be greatly diminished by the passage of time; and (2) Darnell had not

even attempted to demonstrate that the twenty-year delay was excusable. *Id.* at 480–81.

In denying Janet's motion to withdraw her plea in this case, the district court likewise concluded that the government would suffer significant prejudice as a result of the twelve-year delay in the event Janet's motion was granted. The case was complex, and the events underlying the offenses dated back more than twenty-five years. The law enforcement officers who investigated the case had all retired, and it would be difficult, if not impossible, to present testimony from many of the victims and witnesses, who were already quite elderly at the time the crimes were committed. The district court also found that Janet had failed to provide a legitimate excuse for her delay in bringing her motion. Indeed, the court found that the twelve-year delay resulted solely and directly from her unlawful decision to flee the court's jurisdiction in an effort to avoid being held accountable for her crimes. Based on these facts alone, the district court concluded that Janet's motion to withdraw her plea was barred under the doctrine of laches.

Janet does not challenge the district court's denial of her motion to withdraw her plea to the conspiracy counts. Instead, she contends that the court erred in failing to address her motion to withdraw from the plea agreement. She argues that her motion to withdraw her plea was separate and distinct from her motion to withdraw from the plea agreement and that it was error for the district court not to address it separately. Because of that error, Janet contends that her case should be remanded.

We find no error in the district court's handling of Janet's motion to withdraw from the plea agreement that would warrant a remand. Although a motion to withdraw a plea is distinct from a motion to withdraw from a plea agreement, we have observed that "the plea agreement and the plea are 'bound up together,'" and thus held that the same standard of "a fair and just reason" for withdrawal applies. *United States v. Standiford*, 148 F.3d 864, 868 (7th Cir. 1998) (quoting *United States v. Hyde*, 520 U.S. 670, 677 (1997)). The district court properly rejected Janet's proffered reasons for withdrawing her plea, and she failed to offer any fair and just reason for a different ruling on her motion to withdraw from the plea agreement.

In essence, Janet sought to be relieved of the provision of her plea agreement in which she waived her right to appeal because she no longer thought it was in her interest. She realized that because she had absconded, the government was no longer bound to recommend a reduction in her offense severity score for acceptance of responsibility or that she receive a sentence at the low end of the applicable guideline range. She also recognized that if it so chose, the government would be free to pursue the remaining charges in the indictment and even issue additional charges based on the same course of conduct. Since the government was no longer bound by the plea agreement, she argued it was only fair that she be released from it as well.

But the government did not seek to be relieved of its obligations to dismiss the remaining charges or refrain from issuing additional charges based on the same course of conduct that led to the initial charges. As we explain below, the fact that

the government was relieved of its obligation to recommend a more lenient sentence was a consequence of Janet's own breach of the plea agreement. It does not constitute a breach of the agreement by the government; nor does it provide a ground for Janet to withdraw from the agreement. A plea agreement is a contract, and absent some breach by the government, a defendant cannot repudiate the contract simply because she no longer thinks it is in her interest. *United States v. Ellison*, 798 F.2d 1102, 1104 (7th Cir. 1986) ("Defendant pled guilty pursuant to his promise to the government and, absent some breach by the government, now cannot attempt to repudiate the contract unless he does so pursuant to Rule 32(d).").

While it is perhaps true that the district court should have explicitly addressed Janet's alternative request, its failure to do so does not warrant a remand. We have consistently declined to remand cases for further proceedings when the outcome of such proceedings is clear and remand would be futile. *See, e.g.*, *United States v. Stephens*, 514 F.3d 703, 713 (7th Cir. 2008) ("Thus, remand would be futile as there is only one plausible conclusion based on the entire record—that there was no *Batson* violation."); *United States v. Purchess*, 107 F.3d 1261, 1269 (7th Cir. 1997) ("Normally, we would remand … . However, in this case, a careful review of the record reveals that the denial of the acceptance of responsibility reduction is well grounded in a permissible factor—the district court's finding that Purchess was not remorseful but was simply trying to obtain a lower sentence. Therefore, remand would be futile, and we affirm the district court's denial of the reduction."). Here, Janet's alternative motion could only have been denied since she offered no "fair and just reason" to withdraw from her plea

agreement. *Sandiford*, 148 F.3d at 868. We thus turn to the effect of the plea agreements, in particular, the enforceability of the appeal waivers.

### 2. *Enforceability of Appeal Waivers*

In their plea agreements, the defendants waived the right to appeal "any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined) on the grounds set forth in [18 U.S.C. §] 3742 or on any ground whatever, in exchange for the concessions made by the United States in this plea agreement." Thus, if the appellate waiver is enforceable, then the defendants' arguments regarding the violation of the Ex Post Facto Clause and the incorrect calculation of the base offense level, as they apply to the conspiracy offenses alone, are barred.

We have consistently stated that "[a] defendant may waive his appeal rights as part of a plea agreement, provided the waiver is clear and unambiguous." *United States v. Jones*, 381 F.3d 615, 619 (7th Cir. 2004) (citing *United States v. Mason*, 343 F.3d 893, 893–94 (7th Cir. 2003); *United States v. Nave*, 302 F.3d 719, 720 (7th Cir. 2002); *United States v. Woolley*, 123 F.3d 627, 631–32 (7th Cir. 1997)). An "appellate waiver 'stands and falls with the rest of the bargain.'" *United States v. Sakellarion*, 649 F.3d 634, 639 (7th Cir. 2011) (quoting *United States v. Whitlow*, 287 F.3d 638, 640 (7th Cir. 2002)). A knowing and voluntary appeal waiver precludes appellate review. *Jones*, 381 F.3d at 619.

The defendants do not argue that their appeal waivers are invalid because their pleas or plea agreements in 2000 were made unknowingly or involuntarily. Instead, they contend that

their appeal waivers are unenforceable because the government breached their plea agreements by failing to recommend sentences at the low end of the applicable guideline range. Because the government breached its obligations under the plea agreements, the defendants argue that it cannot enforce the appeal waivers against them.

The government, on the other hand, insists that it did not breach the plea agreements. Instead, the government contends that it was relieved of its obligation to recommend a sentence at the low end of the applicable guideline range by the defendants' own breach of the plea agreements. More specifically, the government argues that its more lenient sentencing recommendation was conditioned on the defendants appearing for sentencing and not absconding. Because they left the state and avoided sentencing for twelve years, the government argues that its obligation to make the favorable sentencing recommendation called for by their plea agreements was excused. It thus follows, the government contends, that it did not breach the agreements and the appeal waivers should be enforced.

As already noted, a plea agreement is a form of contract. *United States v. Diaz-Jimenez*, 622 F.3d 692, 694 (7th Cir. 2010). Consequently, we have often remarked that "[d]isputes over plea agreements are usefully viewed through the lens of contract law." E.g., *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005) (collecting cases). A breach of a plea agreement by the prosecutor is actionable, and the general rule is that where such a breach has been shown, the defendant is entitled to either specific performance or rescission, i.e., withdrawal of the plea. *Santobello v. New York*, 404 U.S. 257, 263 (1971); *United*

*States v. Grimm*, 170 F.3d 760, 765 (7th Cir. 1999). Of course, a plea agreement also creates obligations for the defendant.

In this case, the defendants waived their rights to a trial and entered pleas of guilty to the two conspiracy counts pursuant to their plea agreements. Yet, these were not their only obligations. An implied but obvious term of any plea agreement is that the defendant show up for sentencing and not flee the jurisdiction. *United States v. Munoz*, 718 F.3d 726, 729 (7th Cir. 2013). The defendants breached this obligation when they fled the district and avoided the punishment for their crimes for twelve years. The defendants' flight constituted a material breach, depriving them of the ability to hold the government to its promise to recommend the low end of the applicable guideline range. *Id.* at 730 ("No defendant could reasonably expect that he could abscond for five years and still hold the government to its promises under the plea agreement."); *see also United States v. Delacruz*, 144 F.3d 492, 495 (7th Cir. 1998) ("Since defendant failed to appear for sentencing and continued his criminal conduct, the government was no longer obligated to recommend a sentence of 24 months at his sentencing hearing."). In the language of contract law, the government's obligation to recommend a low end of the guideline sentence was excused by the defendants' breach of their obligation to show up for sentencing and not flee the jurisdiction. *See Puckett v. United States*, 556 U.S. 129, 140 n.2 (2009) (citing 39 WILLISTON ON CONTRACTS § 39:3 (4th ed. 2009)).

The defendants contend, however, that if the government is relieved of its obligation to recommend a lesser sentence then they are likewise relieved of the appeal waivers. They cite

*Munoz* in support of their argument, noting that in that case the government treated the plea agreement as rescinded after the defendant absconded and therefore did not attempt to enforce the appeal waiver in the agreement. 718 F.3d at 730–31. We acknowledged in *Munoz* that we would face a more difficult issue if the government had sought to enforce the appeal waiver. *Id.* Here the government does seek to enforce the waiver, and so the issue is now before us. We again find the answer in well established principles of contract law.

"[A] classic rule of contract law, is that a party should be prevented from benefitting from its own breach." *Assaf v. Trinity Medical Center*, 696 F.3d 681, 686 (7th Cir. 2012) (citing 23 WILLISTON § 63:8). Thus, the fact that a party has breached a portion of a contract does not automatically result in the discharge of that party's remaining obligations. Otherwise, a party would have the power to escape an unwanted contractual obligation simply by breaching another provision of the contract under which it arises. 13 WILLISTON § 39.1. Such a rule would seriously undermine the law of contracts. *Id*. Instead, the rule is that where one party commits a material breach, the non-breaching party may elect to terminate the entire agreement or seek to enforce the remainder of the contract. *See* 23 WILLISTON § 63:8 ("When a contract is breached, the injured party is not required to repudiate the contract in order to preserve its right to sue the other for breach of the contract; after a breach, the injured party may elect to continue the agreement and claim damages from the defaulting party for his nonperformance.") (citing RESTATEMENT (SECOND) OF CONTRACTS § 246). Here, the government has elected to enforce the remaining provisions of the plea agreements, including the

appeal waivers. We see no reason why it should not be allowed to do so.

As we have already explained, the government did not breach the defendants' plea agreements by failing to recommend sentences at the low end of the applicable guideline ranges because the obligation to make such a recommendation was excused by the defendants' flight to avoid sentencing and the twelve-year reprieve they gained as a result. Given the fact that the defendants not only failed to accept responsibility for their crimes, but entirely escaped responsibility for twelve years, a recommendation for leniency would have made no sense on its face. The law does not require the government to make a nonsensical recommendation.

The defendants also contend, however, that the government breached their plea agreements in two other ways. They note that the government also stated in their agreements that it "will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him [and her], and related matters, including matters in aggravation and mitigation relevant to the issue of sentencing." Plea Agreements ¶ 14. Additionally, the government agreed "to bring no additional criminal charges in the Central District of Illinois against the defendant[s] relating to or arising from the offenses charged in this indictment, except for any crime of violence which might have been committed with regard to this or other matters and which is not known to the government at this time." *Id.* ¶ 17. The defendants contend that the government failed to perform both of these obligations as well. It did not apprise the district court of matters in mitigation, and it charged them with failing

to appear at their sentencing, a charge "relating to" the conspiracy charges in the indictment. Having failed to perform its own obligations under the plea agreements, the defendants contend, the government is not entitled to enforcement of the appeal waivers.

We reject the defendants' argument that the government breached the plea agreements by failing to apprise the district court of matters in mitigation and by bringing additional charges relating to the offenses charged in the fraud indictment. As to mitigating factors, the defendants contend that the government never mentioned Janet's lesser role in the offense or Nelson's health issues. They also contend that the government failed to acknowledge that neither had a criminal record prior to the conspiracy and that they had lived "a simple, lawful life while on the lam." But there was no need for the government to advise the sentencing judge of Janet's role, Nelson's health, or that neither had a prior criminal record. These facts were apparent from the pre-sentence report, and the government never disputed them. As for their claim that their lifestyle while on the lam was simple and law abiding, we simply note that fleeing the district to avoid sentencing and then living and working under false identities so as to avoid apprehension for twelve years are not mitigating factors. The government did not violate the defendants' plea agreements by failing to say otherwise.

We also reject the defendants' argument that the charges for failure to appear at sentencing violated the government's obligation not to bring additional charges "relating to or arising from the offenses charged in the indictment." Under their reading of the plea agreements, the defendants would

have been immune from prosecution for any offense they could have thereafter committed in the Central District of Illinois as long as they could tie it somehow to their previous fraud. A bank robbery to fund their get-away, for example, or even a retaliatory murder of a government witness (only crimes of violence already committed are excluded) would be "related to" the fraud offenses in the same sense as their failure to appear. Such a reading of the agreements would be both absurd and contrary to public policy.

"Plea agreements are contracts, and their content and meaning are determined according to ordinary contract principles." *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992). This means that when a plea agreement is unambiguous on its face, this Court generally interprets the agreement according to its plain meaning. *United States v. Monroe*, 580 F.3d 552, 556 (7th Cir. 2009). "When the language of an agreement is ambiguous, however, the essence of the particular agreement and the Government's conduct relating to its obligations in that case are determinative." *Id.* (internal quotations omitted). "Although the government must fulfill any express or implied promise made in exchange for a guilty plea, the parties' rights under the plea agreement are limited to those matters upon which they actually agreed." *United States v. Williams*, 102 F.3d 923, 927 (7th Cir. 1996) (citing *United States v. Jimenez*, 992 F.2d 131, 134 (7th Cir. 1993)). Moreover, "[w]hen interpreting such agreements, . . . we must bear in mind the special public-interest concerns that arise in the plea agreement context." *Monroe*, 580 F.3d at 556. Finally, courts eschew interpretations of contract provisions that make them unreasonable or illegal. 11 WILLISTON § 32:11; *Aronson v. K. Arakelian,*

*Inc.*, 154 F.2d 231, 233 (7th Cir. 1946) ("[A] contract will not be presumed to have imposed an absurd or impossible condition on one of the parties, but will be interpreted as the parties must be supposed to have understood the conditions at the time.").

Applying these principles here, we conclude that the government's promise to bring no additional charges against the defendants was limited to charges that were based on the same course of conduct as the conspiracy charges. Neither party believed the prohibition applied to future crimes, and while it certainly could have been more clearly written, a reasonable reading of the entire provision supports such an interpretation. The fact that the exclusion for crimes of violence is limited to past crimes suggests that the general prohibition was so limited as well. More importantly, not limiting the prohibition to past crimes would make it absurd and probably illegal. It therefore follows that the government's decision to charge the defendants with failure to appear did not breach their plea agreements.

As a final argument against enforcement of their appeal waivers, the defendants argue that the government misled the sentencing court by representing that even if the appeal waivers remained enforceable, they would be able to benefit from a favorable ruling in *Peugh*, which was then pending before the Supreme Court. That is not the law. *See United States v. McGraw*, 571 F.3d 624, 631 (7th Cir. 2009) ("We have consistently rejected arguments that an appeal waiver is invalid because the defendant did not anticipate subsequent legal developments."). The defendants contend that the government's misstatement of the law convinced the district court that they would be able to obtain relief if *Peugh* were decided

in their favor. Because of its misrepresentation of law, they argue that the government is estopped from now enforcing the waivers.

"Judicial estoppel is an equitable concept that prevents parties from playing 'fast and loose' with the courts by prevailing twice on opposing theories." *In re Airadigm Communications, Inc.*, 616 F.3d 642, 661 (7th Cir. 2010) (quoting *Butler v. Vill. of Round Lake Police Dep't.*, 585 F.3d 1020, 1022 (7th Cir. 2009)). Although there is no formula for judicial estoppel, the Supreme Court has identified at least three pertinent factors for courts to examine: "(1) whether the party's later position was 'clearly inconsistent' with its earlier position; (2) whether the party against whom estoppel is asserted in a later proceeding has succeeded in persuading the court in the earlier proceeding; and (3) whether the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–01 (2001). The doctrine does not apply here.

The question of whether the defendants would be able to appeal in the event the Supreme Court abrogated *Demaree* was raised by the district judge in the context of a hastily scheduled telephone hearing on Nelson Hallahan's motion to continue the sentencing hearing or withdraw from the appeal waiver provision of the plea agreement. After the government stated it was "not willing to carve out a portion of the plea agreement," the court asked the government if it was its understanding that the appeal waiver would preclude the defendants from seeking relief if *Peugh* was decided in their favor. One of the two prosecutors on the line responded:

> If the Supreme Court makes a change in the law, if
> there is a change in the law, and in that instance, *I
> think – I'm not sure but I think* that there would be an
> avenue available to him *if I'm not mistaken*. In other
> words, if there was a mistake in law in the sentence,
> then *I think* that would come under the words of a
> miscarriage of justice *if I'm not mistaken*; and that he
> could petition the Seventh Circuit to bring an action
> in the district court. *I'm not certain about that but I
> think* that there is an avenue available for him to do
> that if he were sentenced in violation of law.

Based on what the prosecutor said and his own under-
standing of the law, the judge stated he thought there was "a
possibility" that the defendants would be able to seek relief. It
was not on that basis, however, that the court denied Nelson's
motion. As the district court explained at sentencing two days
later, it denied the motion because it did not believe it had the
authority to strike certain portions of the plea agreements the
parties had negotiated over one party's objection.

The government's tentative response to the court's ques-
tion, offered with explicit cautions of its uncertainty, is not the
kind of statement that can support a claim of judicial estoppel.
Even if it could, it did not form the basis of the court's ruling
against the defendants. The government did not derive an
unfair advantage from its response, nor did the defendants
incur an unfair detriment. The government is thus not
estopped from asserting the appeal waivers.

We therefore conclude that the defendants' appeal waivers
are enforceable. But as we said before we began down this

road, the waivers do not bar entirely the defendants' claims that the district court erred in calculating the guidelines on the conspiracy counts. The defendants did not waive their right to appeal the sentences imposed for their failure to appear at sentencing, and to the extent that the district court's guideline calculation on the conspiracy counts was used to determine the guideline sentence for their failure to appear, their argument that the district court erred in its guideline calculation is properly before us. It is to that issue that we now turn.

## B. Calculation of Sentence Guideline for Failure to Appear

The district court sentenced each of the defendants on three separate counts. The underlying offenses of conspiracy to commit mail and bank fraud, and conspiracy to commit money laundering carried maximum terms of 20 years and 5 years, respectively. 18 U.S.C. §§ 1341, 1956(h), and 371. The offense of failure to appear for sentencing on a felony punishable by more than 15 years in prison is itself punishable by a term of imprisonment of not more than ten years. 18 U.S.C. § 3146(b)(A)(i). In addition, a term of imprisonment imposed for an offense of failure to appear must be consecutive to the sentence of imprisonment for any other offense. 18 U.S.C. § 3146(b)(2).

The Guidelines prescribe that when a defendant is to be sentenced at the same time for more than one offense, closely related counts are grouped and a single offense level is determined. U.S.S.G. § 3D1.1(a). Two or more counts are considered closely related if they involve substantially the same harm. *Id.* § 3D1.2. Counts are deemed to involve substan-

tially the same harm when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." *Id.* § 3D1.2(b). Counts also involve substantially the same harm when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." *Id.* § 3D1.2(c). For offenses that are grouped together, the count that has the highest offense level is used to determine the proper guideline range for the entire group. *Id.* § 3D1.3(a).

In this case, the failure to appear count was properly grouped with the two conspiracy counts because the conduct it embodied was treated as an adjustment to the offense level applicable to the underlying counts. Failure to appear before sentencing is treated as an obstruction of the underlying offense under § 3C1.1, and the offense level is increased by two levels. *Id.* § 2J1.6 cmt. n.3. When a defendant is sentenced both for the underlying offense and failure to appear, the sentencing court is to determine the total punishment and then impose a portion of the total as the sentence for the failure to appear count that is to run consecutive to the underlying offense or offenses. *Id.* By way of illustration, the Application Note offers the following example:

> [I]f the combined applicable guideline range for both counts is 30–37 months and the court determines that a "total punishment" of 36 months is appropriate, a sentence of 30 months for the underlying offense plus a consecutive six months' sentence for the failure to appear count would satisfy these requirements.

*Id.*

It is clear from the above example that any error in calculating the combined guideline range will have a direct impact on the court's sentencing determination for failure to appear. This follows because the combined guideline range is the starting point for determining the total sentence, a portion of which must be imposed for the failure to appear. It may be that the district court would have imposed the same sentence for the failure to appear counts even if it started with lower combined guideline ranges. But because we cannot know whether it would have done so, we cannot say that an error in calculating the combined guideline is harmless. *See United States v. Love*, 680 F.3d 994, 998 (7th Cir. 2012) ("Such an error is not harmless because it is impossible to know whether the district court would have imposed the same sentence had it not committed this procedural error."). Notwithstanding their appeal waivers on the conspiracy counts, the defendants thus retain their right to challenge the combined guideline calculation used in the determination of their sentences for failing to appear.

The count with the highest offense level among the three on which the defendants were sentenced was conspiracy to commit money laundering. It was the offense level for that count that was therefore used to determine the guideline sentence range for the entire group, including the failure to appear. The defendants contend that the district court erred in calculating the offense level for the conspiracy to commit money laundering count in two respects: (1) the court used the wrong Guidelines; and (2) the court applied the wrong base level. As a result, they contend that the court used the wrong

sentence range in determining their sentences for failure to appear. We will address each in turn.

### 1. Wrong Guidelines

The defendants first argue based on *Peugh* that, under the Ex Post Facto Clause, the district court was required to use the version of the Guidelines that was in effect at the time they committed those crimes. As noted above, under the Guidelines in effect at the time of the offenses, the advisory range would have been 121 to 151 months for Nelson and 97 to 121 months for Janet. Under the 2012 version of the Guidelines, the district court determined that their advisory sentence ranges were 210 to 262 months for Nelson and 135 to 168 months for Janet. Because the district court's reliance on the more recent version of the Guidelines resulted in a higher combined offense level that was also used to determine their sentences on the failure to appear counts, the defendants contend that at least the sentence on that count must be vacated. And because the sentences the district court imposed for the failure to appear counts were determined in relation to the sentences it imposed on the conspiracy counts, they argue that the entire sentence should be vacated so that the district court can fashion a complete and coherent sentencing package. *See United States v. Martenson*, 178 F.3d 457, 462 (7th Cir. 1999) ("When one or more components of a defendant's sentence are held to be illegal, trial judges are permitted to reevaluate the sentencing package in light of the changed circumstances and resentence the defendant to effectuate the original sentencing intent.") (internal quotation marks omitted).

In response, the government argues that, notwithstanding *Peugh*, the district court's use of the newer version of the Guidelines did not violate the Ex Post Facto Clause. The government's argument rests on the Guidelines' "one-book rule." That rule states that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3). Essentially the same rule was contained in the 1998 Guidelines. The crime of failure to appear, the government notes, is a continuing offense. *See United States v. McIntosh*, 702 F.3d 381, 387 (7th Cir. 2012) ("Each day that he knowingly and wilfully continued to evade the service of his prison sentence violated the statute."). Thus, the defendants continued to commit that offense until they were apprehended in May 2012, and under the one-book rule, the latter version of the Guidelines should apply. The government points out that in *United States v. Vivit*, this Court rejected an ex post facto challenge to the application of the one-book rule where the defendant was sentenced for multiple offenses, one of which occurred after a higher guideline became effective. There the Court held that "[t]he grouping rules, enacted in 1987, provide warning to criminals that completing another criminal offense similar to one committed previously places them in peril of sentencing under a revised version of the Guidelines." 214 F.3d 908, 919 (7th Cir. 2000). It likewise follows here, the government contends, that application of the newer version of the Guidelines in this case did not violate the defendants' rights under the Ex Post Facto Clause.

The defendants argue in reply that the government waived its argument under the one-book rule because it failed to present it in the district court. But of course, there was no need to make the argument in the district court because under then-existing circuit precedent, use of the Guidelines in effect at the time of sentencing was not considered a violation of the Ex Post Facto Clause. It was only after the Supreme Court ruled otherwise in *Peugh* that the issue arose. A party does not waive an argument it does not make in the trial court which, under then-existing precedent, it had no reason to offer.

The defendants also argue that *McIntosh* involved the crime of failure to surrender for service of a sentence, as opposed to the crime of failure to appear for sentencing and, further, that it did not involve a claimed ex post facto violation. We fail to see any principled reason why a failure to appear for sentencing would be any less a continuing offense than a failure to surrender for service of a sentence, and the defendants have offered none. Indeed, other courts that have considered the issue have likewise concluded that failure to appear for sentencing is a continuing offense. *See, e.g.*, *United States v. Green*, 305 F.3d 422, 432 (6th Cir. 2002); *United States v. Gray*, 876 F.2d 1411 (9th Cir. 1989); *United States v. Lopez*, 961 F.2d 1058 (2d Cir. 1992). Thus, in *United States v. Alcarez Camacho* the Guidelines were found to apply to a defendant who failed to appear for his trial before the effective date of the Guidelines, but was apprehended thereafter. 340 F.3d 794 (9th Cir. 2003).

The fact that *McIntosh* did not involve a claimed ex post facto violation is likewise irrelevant. It is the reasoning of *Vivit* that demonstrates why application of the one-book rule in this case does not result in an ex post facto violation. *Vivit* rested on

the Supreme Court's observation that "[c]ritical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." 214 F.3d at 919 (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)). *Vivit* held that the grouping and one-book rules provided sufficient notice to the defendant in that case that his earlier offenses would be sentenced under the revised guidelines if he continued to commit related offenses. 214 F.3d at 919. The same conclusion was reached in the overwhelming majority of circuits that considered the issue prior to *Peugh* and by the only other circuit that has considered the issue since. *United States v. Pagan-Ferrer*, 736 F.3d 573, 597–99 (1st Cir. 2013) (collecting cases).

We see no reason why a different result should follow here. We therefore reject the defendants' argument that the district court erred in failing to use the 1998 version of the Guidelines to calculate the offense level for the conspiracy counts. While it appears, based on the date of their arrest, that the 2011 version of the Guidelines should have been used, the defendants have offered no argument that their sentence ranges would have been lower. We therefore find no error in using the later version.

### 2. *Wrong Base Level*

Wholly apart from which version of the Guidelines applies, the defendants argue further that the district court erred in determining the base offense level for the money laundering offense. They claim that the error occurred when the district

court adopted the offense level recommended by the probation officer in the pre-sentence report. The offense level recommended by the probation officer was one level too high, they contend, because the agent erroneously set the base level for the money laundering offense at seven as opposed to six. After adding in the other applicable adjustments, the probation officer recommended an offense level of 33 for Janet and 37 for Nelson. Neither party objected, and the district court therefore adopted the probation officer's recommendations for its guideline calculation. Reducing the offense level by one would have resulted in a lower sentence range of 121 to 151 months for Janet and 188 to 235 months for Nelson. The defendants contend that this error alone amounts to plain error and requires that their sentences be vacated.

The government concedes that the district court plainly erred in calculating the offense level on the conspiracy counts, but argues that relief is unavailable since the defendants waived their right to appeal their sentences on the conspiracy counts. As we have already pointed out, however, because the failure to appear offenses were grouped with the conspiracy counts, any error in the offense level calculation for those offenses would infect the court's sentence determination for the failure to appear. We therefore do not consider their rights to appeal the issue waived.

This Court generally "review[s] the district court's application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010). But where, as here, a sentencing argument is raised for the first time on appeal, this Court's review is for plain error. *See* Fed. R. Crim. P. 52(b) ("A plain error that

affects substantial rights may be considered even though it was not brought to the court's attention."). Plain error is a rigorous standard. *United States v. Orr*, 622 F.3d 864, 868 (7th Cir. 2010). Under this rule, we may, in our discretion "correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and brackets omitted). We find no plain error here.

Indeed, as to the calculation of the guideline sentence, we find no error at all, notwithstanding the government's concession that the district court erred in adopting the recommended offense level in the pre-sentence report. The defendants contend that the sentence range recommended by the probation officer was in error because she used a base level of seven instead of six to calculate the total offense level for the money laundering offense. We disagree. Under § 2S1.1 of the Guidelines, the base offense level for money laundering is:

> The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined.

U.S.S.G. § 2S1.1(a)(1). The underlying offense from which the laundered funds were obtained here was the conspiracy to commit mail and bank fraud, which the defendants also committed, and the offense level for that offense could be determined. Thus, the base level for the money laundering offense was the offense level for the fraud conspiracy.

The base level for a conspiracy is taken from the guideline for the substantive offense. *Id.* § 2X1.1(a). The guideline for mail and bank fraud is § 2B1.1, which states that the base level is seven "if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more." *Id.* § 2B1.1(a)(1). Mail and bank fraud are referenced to § 2B1.1 in the statutory index to the Guidelines, and each has a statutory maximum term of imprisonment of 20 years or more. It therefore follows that seven was the proper base level for that offense.

The only other adjustment that the defendants challenge is a two-level upward adjustment to Nelson's offense level, but as the government points out, that was for violation of a 1995 State administrative order to which only Nelson was subject. This adjustment, to which the defendants offer no reply, plus the remaining adjustments, over which there is no dispute, result in the offense levels used by the district court to calculate the defendants' guideline sentences. We therefore conclude that the district court did not err in calculating the guideline range.

### C. Imposition of Sentence for Failure to Appear

The defendants also argue that the district court failed to properly follow the Guidelines procedure for imposing the sentences on the failure to appear counts. Rather than determine the total sentence and then apportion it between the underlying conspiracy offenses and the offense of failure to appear as the Guidelines Manual directs, they contend that the district court simply imposed a low end of the guideline sentence for the conspiracy offenses and then imposed an additional five years for the failure to appear. They also note that the probation officer who prepared the pre-sentence reports failed to even include a separate guideline calculation for the failure to appear count in his report. A proper calculation would have shown that the guideline range for that offense alone was between 12 and 18 months. Although they concede that the guideline range for the money laundering conspiracy provided the total sentence range for all three offenses, the defendants contend that by failing to include the individual calculation for the failure to appear, the probation officer failed to provide the district court with essential guidance as to that offense. This, they contend, also constitutes plain error that requires their sentences be vacated.

We reject the defendants' arguments that the district court failed to properly apply § 2J1.6 and that the failure to calculate a separate sentencing range for the failure to appear offense amounts to plain error. Although the pre-sentence report may not have demonstrated a clear understanding of the failure to appear guideline, the district court certainly did. In its sentencing comments, the court explained that it recognized that the advisory guideline ranges for the defendants reflected an

adjustment for their failure to appear and that the range was intended to encompass the total punishment the defendants were to receive for all of the offenses. The court specifically acknowledged that it was to apportion part of the total sentence it decided to impose on the underlying offenses and part on the offense of failure to appear. The court also recognized, however, that it could impose a sentence above the guideline range if it concluded such sentence was appropriate upon consideration of the factors set forth in 18 U.S.C. § 3553. Because of the aggravating circumstances of the crimes and, in particular, the fact that "for 12 years these hundreds of trusting people were denied justice," the court concluded that a variance was warranted. The court therefore sentenced Janet to 195 months and Nelson to 270 months, each representing five years above the low end of their respective guidelines.

The defendants contend, however, that the district court failed to adequately explain how it arrived at the total sentences it imposed. They note that the court failed to tie the 60-month sentence it imposed on the failure to appear counts to the guideline range that would have applied for that offense alone. They also contend that the court showed no recognition that the calculated guideline range for all three offenses already included a two-level enhancement for their failure to appear. These errors, the defendants argue, were prejudicial and seriously affect the fairness, integrity and public reputation of the judicial proceedings.

We disagree. First, we note it is simply not true that the district court failed to recognize that the guideline range it calculated for the entire group of offenses included a two-level enhancement for their failure to appear. As noted above, the

court gave explicit recognition of this fact in its sentencing comments. It is true that the court did not consider a separate guideline range for the failure to appear counts alone. But as the defendants acknowledge, the guideline for that offense by itself played no role in determining the applicable guideline range in this case because their failure to appear offenses were grouped with the conspiracy counts. True, we have said that when a court imposes an above guideline sentence for an additional crime that is already factored into the guideline range "it is wise to see how much incremental punishment the Sentencing Commission recommends." *United States v. Kirkpatrick*, 589 F.3d 414, 416 (7th Cir. 2009). But we have never said that a district court's failure to consider a guideline range that does not directly apply constitutes reversible error by itself. In *Kirkpatrick,* the district court imposed a sentence that was more than double the top of the guideline range for possession of a firearm by a felon based on the fact that the defendant had lied to investigating officers. *Id.* at 415. Given the amount of the variance, we held that the sentencing court had a greater duty to tie its sentence to the Guidelines. Here, the variance was far less, only 16% over the top end of the guideline range for Janet and even less for Nelson. The aggravating factors highlighted by the district court adequately justified the upward adjustments it imposed.

In its sentencing comments, the district court noted that the victims of the defendants' fraud were neither wealthy nor sophisticated, and many were elderly. The money they lost was their life savings that they intended as a loan to someone they regarded as a friend, not an investment with attendant risk. But the truly aggravating factor that warranted the

upward variance, the court explained, was the fact that the defendants had avoided the consequences of their crimes for twelve years. Not only did they fail to accept responsibility, they escaped responsibility. The court noted that "for 12 years these hundreds of trusting people were denied justice." As the court observed, the defendants not only stole their victims' money, but then stole their right to a sense of justice for the wrong they had suffered, particularly as to those victims who died before the defendants were apprehended.

We also note that by absconding, the defendants "flouted the judicial process and interfered with the efficient operation of the courts." *United States v. Morgan*, 254 F.3d 424, 427 (2d Cir. 2001). As we explained in *United States v. Elliott* where the defendant had been a fugitive for almost 15 years, "the law's deterrent and retributive effect can be maintained, in the event of prolonged fugitive status, only by substantial incremental penalties." 467 F.3d 688, 692 (7th Cir. 2006). There, we noted, "[e]ven imposing the statutory maximum of 10 years for Elliott's failure-to-report offense would not bring the law's deterrent power in 2004 up to what it would have been had Elliott reported as required in 1989." *Id.* Given the number of years the defendants were able avoid the prison sentences they knew they had earned, the failure to appear guideline range, by itself, would have provided little guidance to the sentencing court in arriving at a just sentence. The district court's failure to consider it under these circumstances does not amount to plain error.

### D.  Substantive Reasonableness

Finally, we turn to Janet Hallahan's contention that the district court's above-guideline 195-month sentence was substantively unreasonable. "We 'will uphold an above-guidelines sentence so long as the district court offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a), for imposing such a sentence.' There is no presumption that a sentence outside the guidelines' range is unreasonable." *United States v. Aldridge*, 642 F.3d 537, 544 (7th Cir. 2011) (quoting *United States v. McIntyre*, 531 F.3d 481, 483 (7th Cir. 2008)). It is also not enough that we "might reasonably have concluded that a different sentence was appropriate … ." *Gall v. United States*, 552 U.S. 38, 51 (2007). "Because the district court has greater familiarity with the case and the individual defendant and therefore an institutional advantage over an appellate court in making sentencing determinations, we must defer, absent an abuse of discretion, to its ruling." *Id.* at 790. "An above-guidelines sentence is more likely to be reasonable if it is based on factors sufficiently particularized to the individual circumstances of the case rather than factors common to offenders with like crimes." *United States v. Jackson*, 547 F.3d 786, 792–93 (7th Cir. 2008) (internal quotation marks omitted).

First, to the extent that Janet Hallahan's challenge to the substantive reasonableness of her sentence relates to the conspiracy and underlying fraud, the appellate waiver acts as a bar to her arguments. Second, as to the permissible arguments regarding her life as a fugitive, which she describes as free of crime and without wealth, as well as other mitigating facts like her age, her argument that the district court did not

consider these facts is inconsistent with the record. Specifically, the district explained that while Janet and Nelson Hallahan "have suffered also from the absence of family connections, living a hunted life, that's of their choosing. They have chose [sic] to live this way. They could have stopped it at any moment, initially by not leaving or by returning at any time during the past 12 years." The court also emphasized that "[Janet] chose to turn her back on the family overtures and to stay on the run." The district court also considered the age of Janet Hallahan, 55 at the time, noting "some sympathy for sentencing anyone in the winter of their life to prison for long terms when they should be at home with their grandchildren and family." In addition, the district court considered the testimony of the victims, the nature of the offense, her violation of the trusting relationships with the victims, the length of the flight from justice, and the effect that flight had on the victims.

We are convinced that the district court considered the factors in § 3553(a) and adequately articulated its decision to impose an above-guideline sentence. Janet Hallahan obviously disagrees with the district court's sentence, and would place the emphasis on other facts, but she has not demonstrated that the district court failed to justify the magnitude of the variance. We find no abuse of discretion in sentencing her to 195 months of imprisonment. *Cf. United States v. Stinefast*, 724 F.3d 925, 932–33 (7th Cir. 2013) (upholding 216-month sentence where the guideline range was 121 to 151 months); *United States v. Taylor*, 701 F.3d 1166, 1174–75 (7th Cir. 2012) (upholding 480-month sentence where the guideline range was 262 to 327 months); *United States v. Abebe*, 651 F.3d 653, 656 (7th Cir. 2011) (upholding 300-month sentence where the guideline range was

84 to 105 months); *United States v. Ellis*, 622 F.3d 784, 800 (7th Cir. 2010) (upholding 90-month sentence where the guideline range was 46 to 57 months); *United States v. McKinney*, 543 F.3d 911, 912–14 (7th Cir. 2008) (upholding 293-month sentence where the guideline range was 188 to 235 months).

### III. CONCLUSION

Accordingly, and for the reasons set forth above, the judgments of the district court are AFFIRMED.