In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3290

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRUCE BROWN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 516— **Joan Humphrey Lefkow**, *Judge.*

ARGUED DECEMBER 12, 2014 — DECIDED MARCH 3 , 2015

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury found Bruce Brown guilty of wire, mail, and bank fraud in connection with a scheme to defraud mortgage lenders. Brown contends that a prior plea agreement resolving 2005 money laundering charges against him barred the government from pursuing charges in the mortgage fraud scheme, and he contends on that basis the

district court should have dismissed the indictment in this case. We affirm.

## I.

In 2005, a federal grand jury in Chicago charged Brown with multiple acts of money laundering. The indictment alleged that Brown conspired with others to engage in financial transactions aimed at concealing the proceeds of illegal narcotics sales, principally through the purchase of luxury cars. The conspiracy allegedly began in 2002 and ended early in 2005 and involved more than $1.5 million in drug proceeds. In addition to conspiracy, Brown was charged with seven substantive acts of money laundering. The case was assigned to Judge Gottschall.

This was, by the way, Brown's second indictment in the Northern District of Illinois. A 2003 indictment had charged him with multiple acts of income tax evasion. That prosecution was resolved by way of a written plea agreement pursuant to which Brown pleaded guilty to one count of filing a false income tax return. He was sentenced to a five-year term of probation that included four months of home confinement.

The 2005 money laundering case against Brown largely fell apart when a key government witness, Kenyatta Coates, refused to testify against Brown as he had promised the government he would do. Against the backdrop of a weakened prosecution case, the parties negotiated a written agreement pursuant to which Brown committed to plead guilty to one count of money laundering involving the June 2003 purchase of a Mercedes Benz automobile by Brown on behalf of Coates. Brown acknowledged that between $5,000 and $10,000 of the

$63,000 cash down payment he made on the car constituted the proceeds of narcotics activity. In exchange for Brown's agreement to plead guilty to this count and to waive his appellate rights, the government agreed to dismiss the other charges and to recommend a sentence of probation and intermittent confinement within the Sentencing Guidelines advisory range of four to ten months. The agreement was executed by the parties on August 21, 2006.

The first page of the plea agreement stated that the agreement "is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 05 CR 73." R. 192 at 2. The charges asserted in that case were set forth on the next page of the agreement. R. 192 at 3 ¶ 1. Beyond a brief notation that Brown's criminal history included his prior conviction in the 2003 tax case (R. 192 at 5 ¶ 6(e)), there was no mention in the agreement of any criminal charges other than those set forth in the 2005 indictment— be they past, present, anticipated, or under investigation. Elsewhere, the agreement confirmed that "no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty." R. 192 at 11 ¶ 21.

Paragraph 20 of the plea agreement spelled out the government's rights in the event that Brown breached the terms of the agreement. As it is this provision that Brown believes barred the subsequent mortgage fraud indictment, we reproduce the paragraph in full here:

> Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or to resentence defendant. Defendant understands and agrees that in the event that this Plea Agreement is breached by defendant, and the Government elects to void the Plea Agreement and prosecute defendant, *any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph*, notwithstanding the expiration of the statute of limitations between the signing of this [A]greement and the commencement of such prosecutions.

R. 192 at 10-11 ¶ 20 (emphasis ours). As we discuss in greater detail below, Brown's argument in this appeal rests on the italicized language.

When Brown appeared before Judge Gottschall on August 21, 2006 (the same date that he signed the agreement) to change his plea to guilty, the judge elicited confirmation from counsel for the government that there were no other agreements other than those set forth in the written plea agreement.

R. 192 at 21.[1] The judge then asked the same question of Brown himself:

> THE COURT:    Okay.  Now,  the lawyers, Mr. Brown, say that there are no other agreements. Does that go along with your understanding?
>
> MR. BROWN:    Yes, Your Honor.
>
> THE COURT:    Okay. Now, what that means as a practical matter is that you haven't been promised anything about the sentence. …

R. 192 at 21. After asking counsel to state their understanding of the calculation of the advisory sentencing range under the Sentencing Guidelines, and confirming that it comported with Brown's understanding, the court again asked Brown whether there was anything apart from the stated terms of the parties' agreement that had induced him to plead guilty.

> THE COURT:    Okay. Now has anyone promised you anything different, Mr. Brown, to get you to plead guilty?
>
> MR. BROWN:    No, Your Honor.
>
> THE COURT:    Has anyone threatened you to try and get you to plead guilty?

---

[1]  The judge actually asked counsel for both parties whether there were any such agreements, but the transcript reflects a response solely from the government's counsel.

MR. BROWN:    No, Your Honor.

R. 192 at 25. After the government briefly outlined the evidence against Brown as to the one charge to which he was pleading guilty, and Brown acknowledged the accuracy of the proffer, the court accepted Brown's change of plea and entered a finding of guilty.

Following the preparation of a presentence report by the probation officer, Brown appeared for sentencing on December 6, 2006. As the probation officer's Guidelines calculations were consistent with those of the parties, the advisory Guidelines range was four to ten months in prison. The court imposed a sentence of three years' probation, along with four months of intermittent confinement, with Brown being credited for the two and one-half months he had already spent in custody when he was initially detained in the case. Both the probation officer and the court expressed doubt at the time as to whether it would be possible for Brown to serve intermittent confinement in the Northern District of Illinois, and their doubts were later confirmed. For that reason, the court subsequently modified Brown's sentence to waive intermittent confinement.

Around the time that the parties agreed to resolve the money laundering case, the FBI had begun an investigation that eventually would culminate in the 2010 charges of mortgage-related fraud. Brown had eventually been released on bond while the 2005 money laundering charges were pending, and it turned out that a house that Brown had posted as security for that bond was one of a number that had been purchased pursuant to the scheme we shall describe in a moment. Brigitte Grose was the owner of this particular house,

and she had been required to file a quitclaim deed in order to facilitate its use as security for Brown's bond. When that house subsequently went into foreclosure, the government started to make inquiries. An FBI agent had already interviewed Grose about the questionable circumstances under which she had purchased that house (and two others) by the time the parties signed the plea agreement in the money laundering case. And Mario Moore, who like Grose was the purchaser of several houses involved in the scheme, was interviewed not long after the plea agreement was signed. Both individuals had discussed Brown's role in the home purchases; and both of them would later be named as defendants along with Brown in the 2010 mortgage fraud indictment. So it is fair to say that although no charges had yet been filed in connection with the mortgage fraud investigation, the government had some inkling by the time Brown pleaded guilty in the money laundering case—and certainly by the time he was sentenced—that he was also implicated in the mortgage fraud scheme that was under investigation. But, as we have pointed out, the plea agreement resolving the money laundering case makes no mention of the mortgage fraud investigation, and Judge Gottschall said nothing about that investigation (if she was even aware of it) when she sentenced Brown.[2]

---

[2]    The record does not make clear whether or to what extent Brown's involvement in the mortgage fraud scheme was brought to Judge Gottschall's attention. Apparently, both the presentence report and the probation officer's confidential sentencing recommendation to the judge indicated that the FBI case agent had supplied the probation officer with information regarding additional offenses that Brown allegedly had
(continued...)

<hr />

[2] (...continued)

committed and which might qualify as relevant conduct vis-à-vis the one money laundering offense to which Brown had pleaded guilty; the prosecutor, on the other hand, had informed the probation officer that there was insufficient evidence to establish that Brown had committed these additional offenses, even under the lesser burden of proof that governs a showing of relevant conduct at sentencing. Judge Gottschall likewise noted at sentencing that the probation officer had been supplied with information concerning "numerous offenses" of which Brown had not been convicted but which might qualify as relevant conduct. R. 195 at 4, 6-7. But neither the judge nor the parties commented on the content of that information, and it is possible, if not likely, that the information had nothing to do with the mortgage fraud scheme (which was still being investigated, and which was distinct in time, participants, and subject matter from the money laundering scheme), but instead concerned the money laundering charges that the government had agreed to dismiss. Indeed, the government has represented that the information recounted in the presentence report concerned only money laundering offenses. *See* R. 191 at 6; R. 232 at 3. Neither the presentence report nor the probation officer's sentencing recommendation is a part of the record in this case; nor are those documents part of the electronic record in the money laundering case. Consequently, we can only speculate on the nature of the other offenses referred to. The sentencing transcript, however, gives us no reason to believe that the information influenced Judge Gottschall's decision as to the sentence. Her remarks at sentencing suggest that she was disinclined to consider this information, *see* R. 195 at 5 ("I'm going to assume that there is no proof that the defendant did these things … ."); she made no finding that Brown had committed additional offenses; and she did, after all order Brown to serve a term of intermittent confinement (four months) at the low end of the advisory Guidelines range.

We acknowledge that Brown did seek disclosure of the probation officer's confidential sentencing recommendation in order to clarify what additional offenses were alluded to in that recommendation, a request that the district court denied. However, because, as we conclude below, there is no

(continued...)

The mortgage fraud scheme had commenced in or about May 2005 and lasted for just under a year. Brown's aim was to extract money from mortgage loans extended to buyers that he located. Brown recruited a licensed loan officer, Walker Smith, to find properties for sale that met the criteria that Brown specified; Brown took care of finding buyers. Once an appropriate property and buyer were located, Brown (with Smith's help) falsified documents in order to convince a lender to issue a mortgage to the buyer. For example, Brown would create documents indicating that the subject property was being leased to a tenant at a substantial monthly rent—thus generating income for the buyer—when in fact the property was not being leased at all. Or the documentation would indicate that the buyer intended to live at the property when in fact the buyer had no such plans. In some instances, the buyer's rental history and other financial data were falsified. Brown, who styled himself as a consultant in these transactions, arranged to have a "decorating allowance" of $5,000 to $10,000 placed in the purchase agreement. That money would be distributed to Brown when the purchase closed, and Brown would split the amount with the buyer. Brown facilitated a total of six mortgage transactions in this manner. The record does not disclose the total amount of money that he extracted for himself from

---

[2] (...continued)
ambiguity in the money laundering plea agreement that warrants an inquiry beyond the four corners of that agreement into the parties' expectations regarding the mortgage fraud charges, there is no need to explore further what information was referred to in the probation officer's sentencing recommendation.

these transactions. But the scheme involved mortgage proceeds totaling $1.8 million and inflicted a loss of just over $1 million on the lenders who financed the mortgages.

In June 2010, a grand jury indicted Brown, among others, on charges arising out of the mortgage fraud scheme. Brown was charged with six counts of wire fraud, two counts of mail fraud, and one count of bank fraud. *See* 18 U.S.C. §§ 1341, 1343, 1344. The case was assigned to Judge Lefkow and tried to a jury, which convicted Brown on all charges save for one of the mail fraud counts that the court dismissed during trial at the government's request. Judge Lefkow ordered Brown to serve a below-Guidelines sentence of 60 months in prison and to make restitution in the amount of $1.067 million.

Approximately five weeks before the trial began, Brown asked the court to dismiss the indictment and to continue the trial date while the motion to dismiss was being briefed.[3] Brown contended that the plea agreement in the 2005 money laundering case barred his prosecution in the 2010 mortgage fraud case absent his breach of the plea agreement, which had not occurred. After reviewing the motion and the government's response in opposition (which argued that the money laundering plea agreement posed no bar to the mortgage fraud charges), the district court denied Brown's request for a postponement of the trial, but allowed Brown to file a reply brief in support of his motion to dismiss once the trial was

---

[3] Brown simultaneously filed a motion with Judge Gottschall to enforce the plea agreement in the 2005 money laundering case; she denied that motion without prejudice. *See United States v. Brown*, 2012 WL 182214, at *3 n.3 (N.D. Ill. Jan. 20, 2012).

concluded. Brown filed that brief prior to his sentencing. With his reply brief, Brown submitted an unsigned affidavit in which he averred that the Assistant United States Attorney handling the money laundering prosecution on the government's behalf promised him that if he agreed to plead guilty to one count of money laundering, "the government would recommend a sentence of probation with intermittent confinement within the applicable Guidelines range and that would be the end of all my cases and matter[s] for which the US Attorney was investigating me, including the mortgage cases." R. 244-1 at 8 ¶ 23.

The district court denied the motion to dismiss in a written opinion. *United States v. Brown*, 2012 WL 182214 (N.D. Ill. Jan. 20, 2012). The court noted that its analysis focused first on the written terms of the agreement; there being no need to consider extrinsic evidence unless the plea agreement was ambiguous on its face. *Id.*, at *3. The court could find no explicit immunity provision within the four corners of the agreement. *Id.*, at *4. Although Brown contended Paragraph 20 contained an implicit promise not to prosecute him for additional crimes of which it was aware at the time of the money laundering plea, the court was not convinced that Paragraph 20 plausibly could be construed to contain such a promise.

> On its face, this clause relates only to the possible penalty for Brown's failure to abide by the terms of the plea agreement. It cannot reasonably be read as a broad grant of immunity. Indeed, the introductory paragraphs of the plea agreement make clear that the agreement relates only to Brown's "criminal

liability in case 05 CR 73 [the money laundering prosecution]" and that the agreement "represents the entire agreement between the United States Attorney" and Brown. In addition, the plea agreement does not mention any conduct that relates to the instant mortgage fraud prosecution. In the absence of any language in the plea agreement indicating a promise of immunity to Brown, the court will not consider the extrinsic evidence submitted in support of Brown's motion. From an objective standpoint, the terms of the money laundering plea agreement do not bar the instant prosecution for mortgage fraud.

*Id.* (citations omitted). The court went on to find no evidence of bad faith or overreaching on the part of the government that would otherwise support Brown's request to dismiss the indictment. *Id.* If, as Brown averred in his affidavit, the government was willing to immunize him for offenses beyond those covered by the 2005 money laundering indictment, he was free to negotiate the inclusion of such an agreement in the plea agreement. *Id.* As it was, both parties had represented to Judge Gottschall that there were no agreements other than those set forth in the written plea agreement. *Id.* And as the court had already noted, no such immunity provision could be found in the terms of the agreement as stated. *Id.*

## II.

We must decide whether the plea agreement between Brown and the government in the money laundering case precluded the government from pursuing the fraud charges

against him in this case. A plea agreement is a contract, and we interpret its terms using ordinary contract principles, while being mindful of the defendant's due process right to fundamental fairness in the criminal proceeding that produced the agreement. *E.g.*, *United States v. Smith*, 759 F.3d 702, 706 (7th Cir.), *cert. denied*, 135 S. Ct. 732 (2014). We examine the terms of the agreement objectively, relying on the plain meaning of its terms as evidence of the parties' intent. *See United States v. Adame-Hernandez*, 763 F.3d 818, 827 (7th Cir. 2014); *United States v. Hallahan*, 756 F.3d 962, 974 (7th Cir.), *cert. denied*, 135 S. Ct. 498 (2014); *United States v. Alcala*, 678 F.3d 574, 577 (7th Cir. 2012). Ambiguities in the contract will be construed against the government. *E.g.*, *id.* We will hold the government to any explicit or implicit promises it has made to the defendant in exchange for his guilty plea, but the government's obligations, like the defendant's, will be limited to matters on which they have actually agreed. *Hallahan*, 756 F.3d at 974; *United States v. Williams*, 102 F.3d 923, 927 (7th Cir. 1996); *United States v. Jimenez*, 992 F.2d 131, 134 (7th Cir. 1993).

Brown contends that the government induced him to plead guilty to one count of money laundering in the 2005 case with the promise to abandon not only the other charges in that case, but any charges related to the mortgage fraud that it had begun to investigate. The plea agreement contains no explicit promise with respect to anything but the money laundering charges (the agreement provided that the government would ask the court to dismiss the other charges set forth in the 2005 indictment). But Brown reads Paragraph 20—which states that in the event of Brown's breach of the agreement, the government would have the right to void the agreement and com-

mence "any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement"—as an implicit promise not to pursue any charges arising from the mortgage fraud scheme.

Brown's reading of that language is far too broad. As Judge Lefkow pointed out, Paragraph 20 is not an immunity provision, but a recitation of the government's rights in the event of Brown's failure to abide by the obligations that the agreement imposed on him. If the right to prosecute Brown for mortgage-related fraud were something that Brown's breach would revive, then one would expect to see elsewhere in the agreement a promise to forgo such claims, just as there was a promise to dismiss the other money laundering charges in exchange for Brown's agreement to plead guilty to one such charge. There was no such promise.[4] Indeed, although the government had begun to actively investigate the mortgage fraud scheme by the time the parties came to terms on the resolution of the money laundering case, there was no reference anywhere in the agreement to the investigation or to any criminal charges that might result from that investigation. There was no mention, in fact, of any potential criminal liability beyond the parameters of the 2005 prosecution. The absence of such a reference is consistent with the first page of the agreement, which states that the agreement "represents the

---

[4]  By contrast, when Brown pleaded guilty in the 2003 tax prosecution, *see supra* at 2, the plea agreement included the government's express promise "not to seek additional income tax charges against the defendant [for acts within a specified time period] which occurred in the Northern District of Illinois and which constitute[ ] the defendant's relevant conduct … ." R. 192 at 59.

entire agreement between the United States Attorney and defendant *regarding defendant's criminal liability in case 05 CR 73.*" R. 192 at 2 (emphasis ours). In short, the plain terms of the agreement indicate that it was meant to resolve the money laundering charges, but not charges related to the government's nascent investigation into the mortgage fraud.

We take Brown's point that the phrase "any prosecutions" is expansive when read in isolation. But contractual language is meant to be read in context, not in the abstract. *See, e.g., United States v. Ataya*, 864 F.2d 1324, 1335-36 (7th Cir. 1988); *Asta, L.L.C. v. Telezygology, Inc.*, 629 F. Supp. 2d 837, 844 (N.D. Ill. 2009). In the context of a plea agreement which recites as its purpose the resolution of Brown's criminal liability in the money laundering prosecution, which provides that Brown will agree to plead guilty to one of the money laundering charges in the 2005 indictment and waive his appellate rights in exchange for the government's agreement to seek dismissal of the other charges in that indictment, and which provides that in the event of Brown's breach of the agreement, the government would have the right to set the agreement aside and pursue any "prosecutions" not time-barred at the time the plea agreement was entered into, "prosecutions" is properly understood to mean only those charges related to the money laundering scheme. To read that term to include unrelated charges that the government had only begun to investigate, when the balance of the agreement offers no suggestion that the parties intended to resolve anything beyond the money laundering case itself, amounts to an unreasonable construction of Paragraph 20. The objective meaning of Paragraph 20 and the balance of the plea agreement is plain, and there was

no promise to abandon charges related to the mortgage fraud scheme.

Apart from the terms of the written agreement, Brown's affidavit, as we have noted, avers that the prosecutor handling the money laundering case made an explicit oral promise to him that the government would drop any mortgage fraud charges as well as the balance of the money laundering charges in exchange for his guilty plea to the single money laundering charge. In Brown's words, "that would be the end of all my cases and matter[s] for which the US Attorney was investigating me, including the mortgage cases." R. 244-1 at 8 ¶ 23. At that point, as Brown recalls it, the prosecutor presented him with the written plea agreement and he signed it. *Id.* Whether as extrinsic evidence of what Paragraph 20 of the plea agreement means, or as evidence of bad faith or overreaching by the government, the affidavit does not support Brown's contention that an evidentiary hearing is necessary to establish exactly what the government promised him in exchange for his plea.

The affidavit is unsigned and thus unsworn, which deprives it of value as actual evidence. *See Sellers v. Henman*, 41 F.3d 1100, 1101, 1102 (7th Cir. 1994); *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 471 (7th Cir. 1990); *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). We may instead treat it as a proffer of what Brown would testify if an evidentiary hearing were convened. But even in that role the affidavit fails to establish the need for further inquiry.

There is no ambiguity in the plea agreement which warrants the presentation of extrinsic evidence. *See, e.g., United States v. Kingcade*, 562 F.3d 794, 797 (7th Cir. 2009). Whatever

question use of the phrase "any prosecutions" in Paragraph 20 might raise is answered, as we have discussed, by the remainder of the agreement, which makes no mention of potential charges related to the mortgage fraud investigation and affirmatively indicates that the agreement was meant to resolve the money laundering case alone. In short, nothing in the agreement reflects a promise by the government not to pursue the charges later advanced in the 2010 indictment.

Brown's affidavit thus posits the existence of a contractual provision beyond those incorporated into the written terms of the plea agreement. Yet the agreement itself states that it represents the entirety of the parties' agreement, and not only the government, but Brown himself, assured Judge Gottschall at the change-of-plea hearing that no other promises had been made to Brown in order to induce him to plead guilty. Brown's affidavit is thus in direct contradiction to what he represented to the court, and what Judge Gottschall relied upon, in evaluating and accepting his guilty plea. Avoiding after-the-fact accusations that an undocumented agreement has been breached is exactly why judges ask the parties to confirm that there are no agreements beyond those committed to writing or otherwise recited in open court. Treating Brown's affidavit as sufficient to commence an inquiry would undermine the interests in candor and finality served by the court's inquiry into undisclosed promises.

We note, finally, that Brown was represented by counsel when he signed the plea agreement and pleaded guilty to the money laundering charge. If, as Brown now represents, the government indeed had promised not to charge Brown in connection with the mortgage fraud it was investigating,

Brown's counsel no doubt would have made sure that promise was placed on the record.

### III.

For all of the foregoing reasons, the district court correctly denied Brown's motion to dismiss the indictment. Brown has not shown that the charges in this case were barred by his plea agreement in the 2005 money laundering prosecution.

AFFIRMED